963 P.2d 279

**ARIZONA DEPARTMENT OF REVE- NUE, an Agency of the State of Arizona, Plaintiff–Appellee,**

v.

**O'CONNOR, CAVANAGH, ANDERSON, KILLINGSWORTH & BESHEARS, P.A., a Professional Corporation, Defendant–Appellant.**

No. 1 CA–TX 97–0001.

Court of Appeals of Arizona, Division 1, Department T.

Dec. 23, 1997.

Reconsideration Denied Jan. 22, 1998.

Review and Cross–Petition for Review Denied Sept. 24, 1998.

---

Grant Woods, Attorney General by Alfred J. Smith, Assistant Attorney General, Phoenix, for Plaintiff–Appellee.

O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A. by Peter C. Guild and Christopher Robbins, Phoenix, for Defendant–Appellant.

## OPINION

McGREGOR, Judge.

This appeal turns on whether the business activities of Dunbar Furniture, Inc., an Indiana concern that built, delivered and installed custom workstations and other furniture for a customer in Phoenix, provided sufficient nexus between Dunbar and Arizona to permit Arizona to impose its retail transaction privilege tax consistently with the

Commerce Clause of the United States Constitution. The tax court found that Arizona could not constitutionally impose the tax on Dunbar and thus held the customer liable for use taxes. For the following reasons, we reverse.

## I.

In the early 1980s, the law firm of O'Connor, Cavanagh, Anderson, Killingsworth & Beshears (the firm) determined to relocate its law offices within Phoenix. The firm decided to include custom secretarial workstations, attorney workstations, and library shelves in its new offices. The firm hired Dallas-based design firm Sheppard & Boyd to assist in designing the new offices, including the custom workstations.

The custom workstations the firm wanted were not manufactured in Arizona or available from any catalog. On the firm's behalf, Sheppard & Boyd interviewed more than a dozen furniture manufacturers. The firm then put the custom furnishings contract out to bid. Dunbar Furniture, Inc., a high quality manufacturer of high-end custom furniture, submitted one of the lowest bids. Because our determination of whether Arizona could impose its transaction privilege tax depends upon the nexus between Dunbar and Arizona, we review in some detail the facts surrounding Dunbar's contacts with Arizona and its transaction with the firm.

From 1985 to 1987, a few manufacturers dominated the furniture market in Arizona. Dunbar was not one of them. Dunbar never registered with the Arizona Corporation Commission as a foreign corporation authorized to do business in Arizona. No public records reflect that Dunbar ever owned any real or personal property in Arizona. The records in the offices of the Arizona Secretary of State and county recorders do not reveal that Dunbar ever filed or recorded a claim of lien or financing statement pertaining to any Arizona real or personal property.

At all relevant times Thomas C. Woodward, an Arizona resident and owner of a furniture retail store in Scottsdale, served as an independent manufacturer's representative for Dunbar and ten to twelve other furniture manufacturers. To Woodward's knowledge, Dunbar had no sales office, ordering center, furniture showroom or customer service office in Arizona at any time material to this litigation.

Before the firm accepted Dunbar's bid, members of the firm's relocation committee met a Dunbar representative in Dallas, and also inspected furniture that Dunbar had manufactured for a Fort Worth bank. Committee members later met in Dallas with Dunbar's president to discuss design issues. Still later, committee members traveled to Berne, Indiana, to visit Dunbar's manufacturing plant. All negotiations between the firm and Dunbar concerning the terms of the custom furnishings contract to which the two ultimately agreed took place in person or by telephone in Phoenix.

In mid-March 1984, the firm awarded the custom furnishings contract to Dunbar. Dunbar and the firm agreed orally that if Dunbar performed satisfactorily, it could use the firm's offices as a showcase for marketing the workstations nationally.

In May 1984, Dunbar employees brought two prototype workstations to Phoenix. They assembled them in a mock-up office constructed at a Phoenix warehouse owned by Goodmans, Inc., a Phoenix furniture retailer. Dunbar's corporate president oversaw the firm's inspection of the prototypes. The parties formally executed a custom furnishings contract in August 1984.

The Dunbar contract required Dunbar to ship, deliver and install the custom furnishings at its own expense. Under the contract, title was to pass to the firm when Dunbar delivered the custom furnishings to the new offices. The risk of loss was to pass when Dunbar had installed the furnishings to the firm's satisfaction.

The workstations and library shelves were sufficiently large that they had to be partially disassembled for shipping, then reassembled on arrival. Dunbar subcontracted its installation obligation to Goodmans. Dunbar's and Goodmans' presidents negotiated the terms of the subcontract in Phoenix.

The custom furnishings contract required Dunbar to make delivery in Dunbar trucks

staffed by Dunbar personnel. When a problem prevented Dunbar from complying with this requirement, the firm authorized Dunbar to hire substitute trucks from North American Van Lines. Four North American trucks made four trips each from Berne, Indiana, to Phoenix in February and March 1985 to deliver the first twelve shipments of custom furniture. Dunbar employees unloaded each truck on arrival at the firm's new offices. Goodmans personnel then installed the custom furnishings under a Dunbar factory representative's supervision.

The Dunbar contract included a three-year warranty. On four occasions Dunbar responded to warranty complaints from the firm. On the first occasion, Dunbar was unable to send a crew of employees to Phoenix to repair an electrical problem in time to accommodate the firm's imminent move to its new offices. It authorized the firm to hire a local electrician at Dunbar's expense instead. In response to the remaining three complaints, Dunbar dispatched crews of employees to the firm's new offices. Twice Dunbar's employees worked a week or more at the firm's new offices to correct the complaints. On the third occasion the firm elected to take a credit against the purchase price in preference to losing the use of the affected workstations while Dunbar's employees worked to bring them into compliance.

The Dunbar contract required Dunbar to produce additional custom furnishings as requested by the firm for eleven years following the contract's formation. In addition to the first large purchase completed in early 1985, Dunbar and the firm engaged in roughly seventeen custom furnishings transactions between June 1985 and April 1989. In the early 1990s, Dunbar went out of business.

From 1985 to 1987, neither Dunbar nor the firm maintained Arizona transaction privilege tax licenses or filed Arizona transaction privilege or use tax returns. The invoices that Dunbar sent the firm during their five-year relationship contained lines for "sales tax" that were never filled in. The firm signed nothing and took no action that Dunbar could have interpreted to suggest that its transactions with the firm were exempt from Arizona transaction privilege or use taxation.

From 1985 to 1987, Dunbar made two smaller furniture sales to customers in Arizona. Both sales involved local retailers, who passed on their Arizona retail transaction privilege tax obligations to their buyers.

The Arizona Department of Revenue (DOR) audited the firm's records for the period December 1, 1984, through September 30, 1990. It assessed use taxes, with interest and penalties, on the purchase price of all custom furnishings the firm had purchased from Dunbar. On the firm's request for redetermination, the DOR Hearing Office sustained the Audit Division's assessment. The firm appealed to the State Board of Tax Appeals, which reversed, holding that the firm's purchases from Dunbar were exempt from Arizona use taxation pursuant to Arizona Revised Statutes Annotated (A.R.S.) section 42–1409.A.1 (Supp.1996).

DOR brought this action in the tax court challenging the Board's ruling. *See* A.R.S. § 42–124.B (Supp.1996). On cross-motions for summary judgment, the tax court ruled that "Dunbar's activities in Arizona did not create a 'substantial nexus' subjecting them to Arizona's transaction privilege tax," and accordingly, the use tax exemption of section 42–1409.A.1 was unavailable to the firm.

From formal judgment entered in accordance with the tax court's ruling, the firm timely appeals. We have jurisdiction pursuant to A.R.S. section 12–2101.B (1994).

## II.

### A.

Arizona imposes an excise tax on the storage, use or consumption of tangible personal property purchased from a retailer.[1] A.R.S.

---

1. A.R.S. § 42–1408 (Supp.1996) provides:

   A. There is levied and imposed an excise tax on the storage, use or consumption in this state of tangible personal property purchased from a retailer, as a percentage of the sales price.
   
   . . . .

   C. The tax rate shall equal the rate of tax applied to retailers according to the respective classification under article 1 of this chapter for the same type of transaction or business activity [retail classification—A.R.S. § 42–1310.01 (Supp.1996)].

§ 42–1408 (Supp.1996). Considered in isolation, the statute obligated the firm to pay a "use tax" on the custom furnishings. However, the statutory scheme also provides a large number of exemptions from that use tax. One of the most significant is defined in section 42–1409.A.1, which states the use tax does not apply to property if receipts from the sale of that property were subject to Arizona's retail transaction privilege tax.[2] Arizona's use tax thus functions primarily as a complement to the retail transaction privilege tax. *See generally People of Faith v. Arizona Dep't of Revenue*, 161 Ariz. 514, 520, 779 P.2d 829, 835 (Tax Ct.1989) ("the measure of the tax imposed by article 1 of this chapter" within A.R.S. § 42–1409.A.1 means all gross receipts on which seller is obligated to pay retail transaction privilege tax, whether or not actually paid, except where seller reasonably concludes from some action of the buyer at or around sale that sale is tax-exempt).

The dispositive question in this appeal, then, is whether Arizona could have imposed on Dunbar, consistent with the Commerce Clause of the United States Constitution, a duty to pay retail transaction privilege taxes on the proceeds of its custom furnishings sales to the firm in Phoenix. If so, the use tax exemption in A.R.S. section 42–1409.A.1.

### B.

■ We derive the principles governing this appeal from *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51

L.Ed.2d 326 (1977), and *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). In *Complete Auto Transit*, the Court upheld a Mississippi business privilege tax as applied to a company that transported GM vehicles by truck from the interstate railhead in Jackson, Mississippi, to GM dealers in Mississippi. The Court synthesized from prior case law the broad rule that a state tax is sustainable against challenge under the "negative" or "dormant" Commerce Clause [3] only if "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." 430 U.S. at 279, 97 S.Ct. at 1079.

In the present case, the parties agree that Arizona's retail transaction privilege tax, as applied to Dunbar, is fairly apportioned, non-discriminatory, and fairly related to services provided by Arizona. The issue on which the firm and DOR disagree is whether Dunbar's retail sales activities had a "substantial nexus" with the State of Arizona.

The Supreme Court squarely addressed the nature of the required "substantial nexus" in *Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).[4] In *Tyler Pipe*, the Court considered a Washington business and occupations excise tax that applied to the in-state business activities of extracting raw materials, manufacturing,

---

D. Every person storing, using or consuming in this state tangible personal property purchased from a retailer is liable for the tax. The person's liability is not extinguished until the tax has been paid to this state.

**2.** A.R.S. § 42–1409.A provides in part:
A. The tax levied by this article does not apply to the storage, use or consumption in this state of the following described tangible personal property:
1. Tangible personal property sold in this state, the gross receipts from the sale of which are included in the measure of the tax imposed by article 1 of this chapter [retail transaction privilege tax—A.R.S. § 42–1310.01 (Supp. 1996)].

**3.** The Commerce Clause, U.S. Const. art. I, § 8, cl. 3, is more than an affirmative grant of power to Congress to regulate commerce "among the

several States." It also has a negative sweep, prohibiting "by its own force" certain state interference with interstate commerce. *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992) (quoting in *Gibbons v. Ogden*, 9 Wheat. 1, 231–32, 239, 6 L.Ed. 23 (1824) (Johnson, J., concurring); *South Carolina State Highway Dep't v. Barnwell Bros., Inc.*, 303 U.S. 177, 185, 58 S.Ct. 510, 513–14, 82 L.Ed. 734 (1938)).

**4.** In *Complete Auto Transit* the taxpayer made no claim that the challenged tax failed to meet any of the four prongs of the Court's newly-synthesized rule. 430 U.S. at 277–78, 97 S.Ct. at 1078. Accordingly, the Court did not discuss the meaning of "substantial nexus."

selling at wholesale, and selling at retail. In 1950, the Washington legislature adopted an exemption from the manufacturing tax for the portion of a manufacturer's output that was subject to the wholesale tax. As a result, local manufacturers paid the manufacturing tax on their interstate sales, while out-of-state manufacturers paid the wholesale tax on their sales in Washington. The Washington Supreme Court invalidated the exemption from the manufacturing tax on the ground that it discriminated against interstate commerce. The United States Supreme Court agreed. 483 U.S. at 240–48, 107 S.Ct. at 2816–20.

Because the Court found that the prohibited discrimination could be readily corrected, it also addressed Tyler Pipe's contention that Washington's wholesale tax could not in any event be applied constitutionally to its wholesale sales in Washington because Tyler Pipe lacked a "sufficient nexus" with the state to justify imposition of a gross receipts tax on the proceeds of its sales. The Court held to the contrary. *Id.* at 248–51, 107 S.Ct. at 2820–22. Although the taxpayer had no office, property, or employees in Washington, the Court found that in-state activities of the taxpayer's independently contracted sales representatives provided the "substantial nexus" sufficient to justify the tax.[5] The Court quoted with approval the state court's test for substantial nexus: "[T]he crucial fac-

tor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Id.* at 250, 107 S.Ct. at 2821 (quoting *Tyler Pipe Indus., Inc. v. State Dep't of Revenue*, 105 Wash.2d 318, 323, 715 P.2d 123, 126 (1986)). *See also Quill Corp. v. North Dakota*, 504 U.S. 298, 312–13, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992).[6]

## C.

■ To determine whether Dunbar's activities in Arizona bring it within the test defined by *Tyler Pipe* and *Complete Auto*, we must first define the "activity" and the "market" involved. As noted above, the question before us is whether Dunbar was obligated to pay retail transaction privilege taxes on its sales of custom workstations and library shelves to the firm. Accordingly, the "activity" whose nexus with Arizona is in question involves Dunbar's retail sales to the firm, as well as the supplemental activities of Dunbar and others on its behalf that were necessary to accomplish and continue the sales.

Dunbar's "market" in Arizona was limited. In contrast to cases such as *Tyler Pipe*, in which the out-of-state taxpayer made sales to a large number of in-state customers, Dun-

---

5. The Court quoted the Washington Supreme Court's summary of the evidence concerning the activities of Tyler Pipe's in-state sales representatives:

   The sales representatives acted daily on behalf of Tyler Pipe in calling on its customers and soliciting orders. They have long-established and valuable relationships with Tyler Pipe's customers. Through sales contacts, the representatives maintain and improve the name recognition, market share, goodwill, and individual customer relations of Tyler Pipe. Tyler Pipe sells in a very competitive market in Washington. The sales representatives provide Tyler Pipe with virtually all their information regarding the Washington market, including: product performance; competing products; pricing, market conditions and trends; existing and upcoming construction products; customer financial liability; and other critical information of a local nature concerning Tyler Pipe's Washington market. The sales representatives in Washington have

   helped Tyler Pipe and have a special relationship to that corporation. The activities of Tyler Pipe's agents in Washington have been substantial.

   483 U.S. at 249–50, 107 S.Ct. at 2821 (quoting *Tyler Pipe Indus., Inc. v. State Dep't of Revenue*, 105 Wash.2d at 318, 325, 715 P.2d 123, 127 (1986)).

6. DOR argues that "the nexus requirements for transaction privilege, sales and use taxes are different, and ... a use tax may be imposed at a lower nexus threshold than that required for a sales tax, which in turn may be imposed at a lower nexus threshold than that required for a transaction privilege tax." Answering Brief at 9–10.

   We do not address this argument because the nexus is at issue here only with respect to the transaction privilege tax. This case does not require us to decide whether a sales or use tax would withstand scrutiny under a lower nexus threshold than the one we apply today.

bar had only one retail customer in Arizona.[7] Dunbar directed virtually all its activities in Arizona to complying with the Dunbar contract and the eleven-year post-contract deal, Dunbar's sole Arizona "market."

Many of the activities associated with Dunbar's ability to establish and maintain a market in Arizona were performed in this state. Dunbar's retail sales themselves took place in Phoenix, where title to the goods and the risk of their loss passed to the firm. Many of the activities that were essential to completing these sales occurred in Phoenix through employees and independent agents of Dunbar acting on Dunbar's behalf. Most took place through not only the physical presence of Dunbar employees or agents, but also the presence of tangible personal property owned by Dunbar, brought to Arizona on its behalf, and used in Arizona to fulfill Dunbar's contract. For example, before Dunbar manufactured the custom workstations, Dunbar employees brought workstation prototypes to Phoenix, assembled them, and used them to gain the firm's approval. Later, contract drivers acting for Dunbar trucked the first twelve custom workstations into Arizona to the firm's Phoenix offices. There, Dunbar employees were waiting to unload and unpack the custom workstations, still owned by Dunbar. Thereafter, employees of a local concern engaged by Dunbar installed the custom workstations, on which Dunbar still bore the risk of loss, under the supervision of a Dunbar employee.

Dunbar employees and agents continued to perform under the Dunbar contract after the firm's acceptance of the initial twelve workstations. Additional workstations were ordered, manufactured, shipped, unloaded, and installed. Further, as required by the contract, Dunbar employees traveled to Phoenix as necessary to remedy conditions claimed to be in breach of Dunbar's contractual warranty. Moreover, from 1985 through 1987, Dunbar employed an independent manufacturer's representative in Phoenix who rendered ser-vices on the firm's furniture order and solicited additional orders on Dunbar's behalf.

Under those circumstances, unless some principle prevents us from considering the activities described above, it is plain that retail transaction privilege taxation of Dunbar's contract proceeds complies with the requirement that "the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Tyler Pipe*, 483 U.S. at 250, 107 S.Ct. at 2821.

### D.

DOR argues that several factors prevent us from finding the required substantial nexus between Dunbar and Arizona. The core bases for DOR's contention are that Dunbar had no office, warehouse, or property in Arizona; none of its employees resided in Arizona; most of the delivery and installation work under the contract between Dunbar and the firm was physically accomplished by employees of a third-party independent contractor and a common carrier; and Dunbar employees' presence in Arizona was almost exclusively connected with the contract.

DOR first argues that under the governing case law, no substantial nexus exists on which a taxing state can impose a gross receipts tax on an out-of-state taxpayer unless, at a minimum, the taxpayer has in-resident employees and a permanent in-state facility, such as an office or other real property. Moreover, DOR asserts, these contacts must be related to the activity sought to be taxed. In support of this proposition, DOR states that it has found not a single case in which a court has sustained a gross receipts tax on an out-of-state taxpayer when one or more of these factors was not present. It then lists eleven cases, all of which were decided before *Tyler Pipe*, to support its theory.

**7.** Unlike DOR, we do not regard this as a factor demonstrating that Dunbar's sales to appellant lacked a substantial nexus to Arizona. The taxpayer in *Standard Pressed Steel Co. v. Department of Revenue of Washington*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), likewise had only one customer in the taxing state. As interpreted by *National Geographic Society v. California Equalization Board*, 430 U.S. 551, 557–58, 97 S.Ct. 1386, 1391, 51 L.Ed.2d 631 (1977), this fact did not preclude taxation of its gross receipts.

■ DOR's theory does not withstand scrutiny under Supreme Court precedent. Although it is clear that the Supreme Court requires a "physical presence" as the *sine qua non* of "substantial nexus," *see Quill Corp. v. North Dakota*, 504 U.S. 298, 309–17, 112 S.Ct. 1904, 1911–16, 119 L.Ed.2d 91 (1992), the Court has never held that the physical presence must include both resident employees and permanent facilities. Indeed, *Tyler Pipe* provides a clear counterexample. There, the Court found the requisite nexus for imposition of a gross receipts tax on a taxpayer who "maintains no office, owns no property, and has no employees residing" in the taxing state, and whose solicitation of business in that state "is directed by executives who maintain their offices out-of-state and by an independent contractor located" in the taxing state. 483 U.S. at 248–51, 107 S.Ct. at 2820–22.

■ DOR also contends that the court cannot consider the in-state activities on Dunbar's behalf by third parties such as Goodmans, Inc., North American Van Lines, and manufacturer's representative Thomas C. Woodward, as links contributing toward a substantial nexus between Dunbar's business activities and Arizona. DOR acknowledges that under *Tyler Pipe, National Geographic Society v. California Equalization Board*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977), and *Scripto, Inc. v. Carson*, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), the in-state activities of salespeople may be attributed to an out-of-state taxpayer in evaluating its nexus to the taxing state, and that this is so whether the salespeople are employees or independent contractors.

DOR asserts that Goodmans and North American Van Lines are "independent third party contractors" and then asks us to distinguish between "independent contractors," whose local efforts on behalf of a taxpayer may be considered on the nexus issue, and "independent third party contractors," whose similar efforts we should regard as of no consequence. We have some difficulty understanding that distinction, and find in any event that neither *Tyler Pipe* nor *Scripto* contains any discussion of or support for DOR's point. In *Tyler Pipe* the Court explicitly reaffirmed its determination in *Scripto* that no constitutional significance attached to the fact that in-state jobbers who solicited orders on behalf of an out-of-state taxpayer were independent contractors rather than employees. 483 U.S. at 250, 107 S.Ct. at 2821. The Court observed that this conclusion was consistent with its more recent decision in *National Geographic. Id.*

■ DOR also urges us not to consider the Arizona-based efforts of Goodmans, North American Van Lines, and manufacturer's representative Thomas Woodward in deciding whether Dunbar had a "substantial nexus" with Arizona. DOR argues that under *Tyler Pipe* and *Scripto*, only the in-state efforts of "full-time salesmen" are material to the inquiry. Contrary to DOR's implication, neither *Tyler Pipe* nor *Scripto* suggests that an independent contractor's local activity on behalf of the out-of-state taxpayer must occur full-time, or daily, before it may be considered on the nexus question. Indeed, *National Geographic*'s summary of *Standard Pressed Steel Co. v. Department of Revenue of Washington*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975) is wholly inconsistent with that view:

> [*Standard Pressed Steel*] involved a direct tax upon the gross receipts of a foreign corporation resulting from sales to a State of Washington customer.... [It] held that maintenance in the taxing State of a single employee, an engineer whose office was in his Washington home and whose primary responsibility was to consult with the Washington-based customer regarding its anticipated needs for the out-of-state supplier's product, established a sufficient relation to activities within the State producing the gross receipts as to support imposition of the tax. It is particularly significant for our purposes in this case that the Court characterized as "frivolous" the argument that the seller's instate activities were so thin and inconsequential that the tax had no reasonable relation to the protection and benefits conferred by the taxing State, for the employee "made possible the realization and continuance of valuable contractual relations between [the seller and its Washington

customer]." 419 U.S., at 562, 95 S.Ct. at 708.

430 U.S. at 557–58, 97 S.Ct. at 1390–91. This language indicates that for the purpose of establishing nexus, the volume of local activity is less significant than the nature of its function on the out-of-state taxpayer's behalf. As the *Tyler Pipe* Court stated, "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." 483 U.S. at 250, 107 S.Ct. at 2821.

### III.

DOR finally argues in the alternative that the firm is liable for Arizona use taxes on its custom furnishings purchases regardless of whether Dunbar was obligated to pay retail transaction privilege taxes on the corresponding sales. DOR reasons that because Dunbar never paid those taxes, its receipts from the sales were never "included in the measure" of the transaction privilege tax within the use tax exemption provided by A.R.S. section 42–1409.A.1.

We decline to address this contention. DOR expressly waived the argument in its motion for summary judgment:

> While the Department here has taken the position that the buyer is relieved of its responsibility for the payment of Use Tax should the seller be responsible for Transaction Privilege Tax, the Department reserves the right in the future, in another case, to argue that the buyer is responsible for the Use Tax *irrespective* of whether the seller has paid the Transaction Privilege Tax unless the buyer can show a receipt indicating that it was charged, and did pay, tax. The Department did not assert this position at the Board of Tax Appeals and is therefore not asserting it here. The resolution of that question will await another day.

(Emphasis in original.)

DOR offers no reason that the scruple it observed in the tax court does not also apply here. Absent a good reason, we do not

consider arguments first articulated in an appellate brief. *See Jimenez v. Sears, Roebuck and Co.,* 183 Ariz. 399, 406, 904 P.2d 861, 868 (1995); *Stewart v. Mutual of Omaha Ins. Co.,* 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991).

### IV.

We reverse the judgment for plaintiff-appellee DOR and remand with directions to enter judgment for the firm.

GRANT, P.J., and WEISBERG, J., concur.