4 P.3d 469

**ARIZONA DEPARTMENT OF REVENUE, an agency of the State of Arizona, Plaintiff–Appellant,**

v.

**CARE COMPUTER SYSTEMS, INC., a Washington corporation, Defendant–Appellee.**

No. 1 CA–TX 98–0003.

Court of Appeals of Arizona, Division 1, Department T.

July 25, 2000.

Janet Napolitano, Attorney General by Joseph Kanefield, Assistant Attorney General, Phoenix, for Appellant.

Lewis and Roca LLP by John P. Frank and Patrick Derdenger, Phoenix, for Appellee.

## OPINION

NOYES, Judge.

¶ 1 The Arizona Department of Revenue ("ADOR") assessed a retail transaction privilege tax on Care Computer Systems, Inc. ("Care"). After the State Board of Tax Appeals vacated the assessment, ADOR appeal-

ed to the Tax Court, which granted summary judgment to Care on grounds that Care did not have "a substantial nexus with Arizona warranting a transaction privilege tax." ADOR then filed this appeal. Our jurisdiction is conferred by Arizona Revised Statutes Annotated section 12–2101(B) (1994), and our decision is guided by *Arizona Department of Revenue v. O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A.*, 192 Ariz. 200, 963 P.2d 279 (1997). We reverse and remand with directions to grant judgment to ADOR.

¶ 2 The material facts in this appeal from summary judgment are not in dispute. Our standard of review is accordingly *de novo* on questions of law and the application of legal principles to the undisputed facts. *See Brink Elec. Constr. Co. v. Arizona Dep't of Revenue*, 184 Ariz. 354, 358, 909 P.2d 421, 425 (1995).

¶ 3 The parties have acknowledged the relevance of *O'Connor* to their dispute. After ADOR filed its notice of appeal, the parties filed a joint motion to stay the appeal because, they reasoned, "the main issue in dispute in the [Care] case, i.e., the degree of nexus necessary for Arizona to constitutionally assess its Transaction Privilege Tax, is the exact same issue that is currently before the Arizona Supreme Court on the Department's Petition for Review in the *O'Connor* case." We granted the stay. After the supreme court denied review of *O'Connor*, we vacated the stay.

¶ 4 Both parties also acknowledge that *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), articulates the applicable test for state tax compliance with the "dormant" or "negative" Commerce Clause. After reviewing its earlier cases, the *Complete Auto* Court stated:

> These decisions ... have sustained a tax against Commerce Clause challenge when [1] the tax is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.

*Id.* at 279, 97 S.Ct. 1076. Both sides further agree that the main dispute here is whether Care's business activities had a "substantial nexus" with Arizona.

¶ 5 In *O'Connor*, as here, the question was whether Arizona activities of an out-of-state vendor created a sufficient nexus with Arizona to permit Arizona to impose retail transaction privilege taxes. 192 Ariz. at 201–02, 963 P.2d at 280–81. The out-of-state vendor, Dunbar Furniture, Inc., built custom workstations for an Arizona customer, the O'Connor law firm. Dunbar had no property, employees, offices, or showrooms in Arizona, although an Arizona retailer did serve as its independent representative on occasion. All negotiations between O'Connor and Dunbar took place in Arizona, either in person or by telephone. During that time, Dunbar employees brought two prototype workstations to Arizona and assembled them for review by O'Connor. Under the parties' contract, title to the workstations passed to O'Connor when they were delivered, and risk of loss passed to O'Connor when they were installed. *See id.* at 202, 963 P.2d at 281. Dunbar employees delivered the workstations to Arizona. A local retailer installed them under contract with Dunbar and under supervision of a Dunbar factory representative. On three occasions thereafter, Dunbar sent employees to the O'Connor offices on warranty claims. *See id.* at 203, 963 P.2d at 282.

¶ 6 ADOR audited O'Connor and assessed use taxes on its workstation purchases. O'Connor protested the tax and prevailed at the administrative level on the theory that, because Dunbar's sales were subject to Arizona retail transaction privilege taxation, O'Connor was not liable for use taxation. The tax court ruled for ADOR. *See id.* We reversed the tax court. *See id.* at 208, 963 P.2d at 287. Relying on *Standard Pressed Steel Co. v. Department of Revenue of Washington*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975); *Complete Auto*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326; *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977); *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97

L.Ed.2d 199 (1987); and *Quill Corp. v. North Dakota By and Through Heitkamp,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), we held that the activities performed in Arizona by and on behalf of Dunbar were significantly associated with Dunbar's ability to "establish and maintain" a market in Arizona for the sales. *O'Connor,* 192 Ariz. at 206, 963 P.2d at 285. The court's "establish and maintain" expression was taken from the following section of *Tyler Pipe:* "As the Washington Supreme Court determined, 'the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" 483 U.S. at 250, 107 S.Ct. 2810.

■ ¶ 7 We begin our analysis in the present appeal by rejecting Care's argument that a retail transaction privilege tax requires a higher level of nexus with the taxing state than does a use tax. This argument is based on cases that were decided when state taxes on interstate commerce were *per se* unconstitutional. *See General Trading Co. v. State Tax Comm'n of Iowa,* 322 U.S. 335, 338, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944); *McLeod v. J.E. Dilworth Co.,* 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944). Later cases based on that same philosophy included *Freeman v. Hewit,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946), and *Spector Motor Service, Inc. v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951). Those two cases were expressly overruled in 1977 by *Complete Auto,* which upheld a privilege tax assessment on an interstate business's gross receipts from the taxing state. 430 U.S. at 288–89, 97 S.Ct. 1076.

> [T]he Court in *Complete Auto* did not merely overrule *Spector,* it also explicitly rejected the formalistic Commerce Clause doctrine that provided the foundation for the *Spector* rule. Thus, the court repudiated the "underlying philosophy ... that interstate commerce should enjoy a sort of 'free trade' immunity from state taxation." The Court likewise disapproved *Freeman v. Hewit*'s "blanket prohibition against any state taxation imposed directly on an interstate transaction."

1 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 4.11[1], at 4–46 (3d ed.1998).

■ ¶ 8 We now decide whether a sufficient nexus existed between Care's business activities and Arizona to subject Care to Arizona's retail transaction privilege tax. In answering that question, we focus on whether the activities performed on Care's behalf in Arizona were "significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Tyler Pipe,* 483 U.S. at 250, 107 S.Ct. 2810.

¶ 9 Care is a Washington corporation that sells and licenses computer hardware and software to nursing homes throughout the United States. Care does not own or lease any real property in Arizona, it does not maintain any inventory in Arizona, it does not maintain a business address in Arizona, and it does not have any employees, independent contractors, or agents based or residing in Arizona.

¶ 10 During the audit period, Care engaged in approximately 180 transactions with Arizona nursing homes. Because Care dealt primarily with nursing home chains, most of its business resulted from mail orders initiated by other nursing homes in the chains. The vast majority of Care's Arizona transactions were conducted by mail or telefax. Two of the transactions were leases and the rest were sales. One lease was for a general ledger program; the other was for three programs and a computer. At the end of both lease terms, the lessees bought the leased goods, and Care credited seventy-five percent of the lease payments to the sales prices. The two transactions, including credited lease payments, totaled $21,720.39. The non-credited rental payments totaled $2,488.47.

¶ 11 Care had one salesperson assigned to Arizona. He lived in Irvine, California, throughout the audit period. His sales efforts focused almost exclusively on southern California. Although Arizona was part of his territory, the salesperson did not initiate sales relationships in Arizona. On seven occasions in the seven-year audit period, however, the Care salesperson took one- to two-

day trips to Arizona to follow up on business prospects. Some sales and licenses resulted from these trips.

¶ 12 Care required that all customer contracts be approved by a corporate officer in Washington before the goods were shipped. All goods were shipped from Care's home office in Washington, F.O.B. origin, either by common carrier or U.S. mail. Title to hardware, software, forms, and supplies sold by Care thus passed to the customer in Washington on delivery to the common carrier or the U.S. Postal Service. By definition, however, title to products that Care leased or licensed to its customers did not pass to the customers. Approximately $105,000 of Care's income from Arizona transactions during the audit period consisted of software licensing fees.

¶ 13 Regarding the training provided by Care to its Arizona customers, Care Executive Vice President Jerry Nelson averred:

Personnel from this company go to the nursing home site, in almost every case, only once. This is to conduct the initial training which may last from one to several days, depending on the number of programs involved. The training representative is dispatched from our home office or another service office, and returns immediately upon completion of the training.... The cost of the training is insignificant compared to the cost of the hardware and software; e.g., the list price of a computer system consisting of the hardware and basic accounting software would run approximately $20,000, whereas the training for such a purchase would cost approximately $1,400. Not all sales involve training at the customer site.... [S]ales to a chain of homes may entail training only once at a central site for a number of homes; or a nursing home may simply opt to do its own training with the help of the user documentation. A review of the business records of our company indicates that we had a training representative in Arizona at widely separated junctures 80 days out of the total 1370 days covered by the audit, July 1, 1987 through March 31, 1991. This amounts to approximately 21 [sic] days per year.

Essentially, all the subsequent support for the computer system is rendered on an interstate basis involving the mail or telephone.... It is extremely rare for our personnel to go back on site after the initial training, largely because the telephone support suffices.

■ ¶ 14 Although Care's Arizona activity was of relatively low volume, "the volume of local activity is less significant than the nature of its function on the out-of-state taxpayer's behalf." *O'Connor,* 192 Ariz. at 208, 963 P.2d at 287. In our opinion, the volume and function of Care's Arizona activity equal or exceed that seen in *O'Connor.* Dunbar, the out-of-state vendor in *O'Connor,* had an Arizona market of one customer, with which it engaged in seventeen transactions. Care had an Arizona market of one *industry,* with which it engaged in about 180 transactions. Dunbar maintained no post-sale ownership of property in Arizona; Care did so with licenses and leases. Care permanently assigned a salesperson to cover Arizona; Dunbar did not. Care routinely sent training personnel into Arizona; Dunbar did not, although it did send in employees to do warranty work.

¶ 15 The trips by Care's salesperson to Arizona were intended to, and did, result in additional sales of Care products. The trips by Care trainers to Arizona were in part intended to, and presumably did, increase the satisfaction level of Arizona customers and encourage other members of that nursing home chain to buy Care products. The Care leases in Arizona were few in number and duration, but they could, and did, develop into outright sales. We therefore conclude that the function and effect of the Arizona activities by Care and Dunbar were the same, that the factual differences between the two cases are therefore not material, and that the result of the "substantial nexus" analysis should be the same in each case.

¶ 16 In addition to *O'Connor,* ADOR relies on *Brown's Furniture, Inc. v. Wagner,* 171 Ill.2d 410, 216 Ill.Dec. 537, 665 N.E.2d 795, 798, 803 (1996) (holding that vendor with no office, plant, or sales force in Illinois but who advertised there and made 942 deliveries there in ten months had substantial nexus with Illinois); *Magnetek Controls, Inc. v.*

*Revenue Division, Department of Treasury,* 221 Mich.App. 400, 562 N.W.2d 219, 224 (1997) (finding substantial nexus from managers' regular travel to other states to assist independent sales representatives and attend trade shows); and *Orvis Co. v. Tax Appeals Tribunal of State of New York,* 86 N.Y.2d 165, 630 N.Y.S.2d 680, 654 N.E.2d 954, 961 (1995) (holding that visits by company personnel to New York for sales and customer relations created substantial nexus). Care asserts that those cases concerned use or sales taxes that vendors had to collect from customers, not transaction privilege or other excise taxes for which the vendors were themselves liable. The assertion is correct, but those cases are nevertheless relevant because they applied the *Complete Auto* test and focused on whether the taxpayers' activities established a "substantial nexus" with the taxing states.

¶ 17 Care relies on *State Tax Commission v. Murray Co. of Texas,* 87 Ariz. 268, 350 P.2d 674, *vacated,* 364 U.S. 289, 81 S.Ct. 53, 5 L.Ed.2d 39, *op. on remand,* 89 Ariz. 61, 358 P.2d 167 (1960),[1] a case that is mainly of historical interest because it was decided when taxation of interstate commerce was still precluded. Care also relies on *City of Phoenix v. West Publishing Co.,* 148 Ariz. 31, 712 P.2d 944 (1985). That case relied on *Murray,* preceded *Tyler Pipe,* drew no distinction between the Due Process and Commerce Clause nexus requirements, and did

not address the "crucial factor" articulated by *Tyler Pipe,* namely, whether West's business activities in Phoenix were significantly associated with establishing and maintaining a market in Phoenix for its sales. Had *West Publishing* focused on that crucial factor, the case might have been decided differently. We therefore distinguish *Murray* and *West Publishing.* Although a comparison of the facts here to the facts there does support Care, that support evaporates when one acknowledges the intervening evolution in Commerce Clause law.

 ¶ 18 Care also argues that an administrative agency must follow its own rules and regulations. We agree with that general proposition. *See, e.g., Cochise County v. Arizona Health Care Cost Containment Sys.,* 170 Ariz. 443, 445, 825 P.2d 968, 970 (1991). Care correctly notes that Arizona Administrative Code ("A.A.C.") R15–5–2307[2] provides that "[s]ales made by vendors maintaining a place of business within Arizona are subject to the Sales Tax." Because Care does not maintain a place of business within Arizona, it argues that ADOR cannot impose a transaction privilege tax on it. We do not agree with that argument. Because "Arizona's use tax thus functions primarily as a complement to the retail transaction privilege tax," *O'Connor,* 192 Ariz. at 204, 963 P.2d at 283, Care's argument, if true, means that ADOR *could* have imposed a use tax on

1. Overruling recognized in *Department of Revenue v. Moki Mac River Expeditions, Inc.,* 160 Ariz. 369, 373–74, 773 P.2d 474, 478–79 (1989), *disapproved in part on other grounds, Wilderness World, Inc. v. Department of Revenue,* 182 Ariz. 196, 200, 895 P.2d 108, 112 (1995).

2. In context, A.A.C. R15–5–2307 provides as follows:

 **R15–5–2306. Distinction Between Sales Tax and Use Tax**
 A. The Sales Tax is imposed on sales made by vendors located within Arizona, while the Use Tax is levied on purchases from out-of-state vendors.
 B. Since the Sales Tax and Use Tax are complementary taxes, only one of the taxes can be applied to a given transaction.
 **R15–5–2307. When a Transaction is Subject to the Sales Tax**
 Sales made by vendors maintaining a place of business within Arizona are subject to the Sales Tax. Sellers operating from a commer-

 cial location or point of distribution, soliciting from a public place of business, or buying and selling articles on their own account within the state are deemed to be in business in Arizona. For example, an office equipment dealer maintains a sales office in Arizona, solicits business from customers in Arizona, and orders the equipment from its home office out of state. Although the seller maintains no stock of inventory in Arizona and the products are shipped directly to the purchaser, he is nevertheless considered to be engaging in business within the state for purposes of this regulation. Such sales are taxable under the Sales Tax statutes.
 **R15–5–2308. When a Transaction is Subject to the Use Tax**
 Purchases made from vendors not maintaining a place of business in this state to Arizona customers are subject to the Use Tax. For example, purchases from an out-of-state vendor selling by mail order to Arizona residents are subject to the Use Tax.

Care's Arizona customers pursuant to A.A.C. R15-5-2308, which provides that "[p]urchases made from vendors not maintaining a place of business in this state to Arizona customers are subject to the Use Tax." That argument, however, was rejected by *O'Connor*.

¶ 19 In *O'Connor*, where ADOR imposed a use tax on the Arizona customer because the vendor did not maintain a place of business in Arizona, this court applied the *Complete Auto* test and the *Tyler Pipe* "crucial factor" and held that ADOR could not impose a use tax on the customer—because it could have imposed a retail transaction privilege tax on the vendor. *O'Connor*, 192 Ariz. at 204–08, 963 P.2d at 283–87. That holding illustrates that the vendor's place of business is an overly simplistic test in light of current Commerce Clause jurisprudence regarding taxation. That the regulation in question specifies that vendors maintaining a place of business in Arizona are subject to the sales tax does not necessarily mean that other vendors are not subject to the sales tax.

¶ 20 In *Brink Electric*, this court rejected an argument similar to the one that Care makes here. 184 Ariz. at 360, 909 P.2d at 427. In that case, the taxpayer argued that A.A.C. R15-5-608, which stated that "[i]nstallation of equipment which becomes permanently attached in a plant or other structure is taxable as a contracting activity," stood for the proposition that there could be no "contracting" with respect to equipment that did not become permanently attached. This court disagreed and held that "[t]he regulation certainly includes permanent attachment of equipment to a structure within the scope of contracting, but does not purport to exclude other real property improvements." *Id.* at 360 n. 6, 909 P.2d at 427 n. 6.

¶ 21 Similarly, while A.A.C. R15-5-2307 certainly says that a taxpayer who maintains a place of business in Arizona will be subject to the transaction privilege tax, it does not purport to exclude a taxpayer who does not maintain a place of business from the tax. In fact, several cases (including *Brink Electric*) have found a taxpayer that did not maintain a place of business in Arizona subject to the transaction privilege tax. *Ari-*

*zona State Tax Commission v. Ensign*, 75 Ariz. 220, 227, 254 P.2d 1029, 1033 (1953), for example, held that an out-of-state taxpayer that did not maintain a place of business in Arizona, but that sold and installed deep well turbine pumps in the state, was subject to the transaction privilege tax on in-state sales because the elements of the sales were effected in Arizona. *See also Centric–Jones Co. v. Town of Marana*, 188 Ariz. 464, 478, 937 P.2d 654, 668 (1996) (upholding a transaction privilege tax on an out-of-state contractor for construction work performed on a portion of the Central Arizona Project located within the Town of Marana even though the contractor's offices were located in Denver, Colorado); *Moki Mac*, 160 Ariz. at 373–75, 773 P.2d at 478–80 (holding that a Utah river rafting business that did not maintain a place of business in Arizona nevertheless had enough activities in Arizona to establish a sufficient constitutional nexus to justify imposing the transaction privilege tax on its gross receipts); *Arizona Dep't of Revenue v. Hane Constr. Co.*, 115 Ariz. 243, 245–46, 564 P.2d 932, 934–35 (1977) (holding that an out-of-state contractor that did not maintain a place of business in Arizona but performed work on an Indian reservation had sufficient business activity in Arizona to be subject to the transaction privilege tax on its contracting income), *rev'd on other grounds, State of Arizona, ex rel., Arizona Dep't of Revenue v. Blaze Constr. Co.*, 190 Ariz. 262, 272, 947 P.2d 836, 846 (1997), *rev'd*, 526 U.S. 32, 39, 119 S.Ct. 957, 143 L.Ed.2d 27 (1999).

■ ¶ 22 Arizona's sales tax and use tax are complementary; they are intended to reach all applicable transactions, either by imposing a sales tax on the seller or a use tax on the purchaser. As the "maintaining a place of business" definition expands with constitutional interpretation, the reach of the sales tax necessarily expands, and the reach of the use tax necessarily contracts, as evidenced by the holding and result in *O'Connor*. On facts not materially different from those in the present case, *O'Connor* held that the use tax would not apply because the sales tax would apply. We follow that analysis here, and we reach the same result. Because the State cannot impose the use tax on

Care's customers on the present facts and in light of the constitutional principles stated in *O'Connor*, the State can lawfully impose a sales tax on Care.

¶ 23 Reversed and remanded with directions to enter judgment for ADOR.

CONCURRING: THOMAS C. KLEINSCHMIDT, Judge.

FIDEL, Presiding Judge, dissenting.

¶ 24 My colleagues acknowledge the proposition that a regulatory agency must follow its own rules and regulations. *Ante* ¶ 18. That proposition, if applied, not merely acknowledged, would bring a swift and simple end to this unnecessarily complicated case.

¶ 25 The majority quotes the applicable regulations in footnote 2 to its opinion. The regulations are remarkably clear, not only when compared with other tax regulations but when compared with other regulations of any sort. R15–5–2306 informs the public that sales taxes (which, the court and parties agree, include transaction privilege taxes) and use taxes are meant to be complementary and that the former are imposed on sales by in-state vendors, while the latter are levied on purchases from out-of-state vendors. In keeping with this complementary intent, R15–5–2307 provides that "[s]ales made by vendors maintaining a place of business within Arizona are subject to the Sales Tax," and R15–5–2308 provides that "[p]urchases made from vendors not maintaining a place of business in this state [by] Arizona customers are subject to the Use Tax." These regulations were drafted in harmony, and there is nothing ambiguous about them. Because Care Computer Systems does not maintain a place of business within Arizona, ADOR, had it followed its own regulations, would have subjected Care's transactions with Arizona customers to a use tax, not a sales tax.

¶ 26 But, says the majority, "the vendor's place of business is an overly simplistic test in light of current Commerce Clause jurisprudence regarding [sales] taxation." *Ante* ¶ 19. In other words, ADOR is not constitutionally obliged to confine its sales taxing authority to vendors who maintain a place of business within Arizona; rather, it has constitutional leeway under current jurisprudence to impose sales taxes upon vendors who do not maintain a place of business within Arizona. Accordingly, the majority reasons, whatever regulations needlessly confine sales taxing authority so narrowly may be ignored.

¶ 27 By taking this approach, my colleagues achieve a curious result. They effectively invalidate R15–5–2306, –2307, and – 2308 for taxing too narrowly—for failing to tax sales to the full extent that the Commerce Clause permits. This is curious because it reverses ordinary constitutional analysis. Ordinarily when courts find a statute or regulation incompatible with the Constitution, they find that it *exceeds* constitutional constraints. Here the opposite pertains; my colleagues render ADOR's sales tax regulations inoperative because they bite off less than ADOR is constitutionally permitted to chew.

¶ 28 I disagree with this approach. That ADOR might have adopted more comprehensive sales tax regulations is beside the point. The immediate question is not whether ADOR might constitutionally adopt broader regulations but whether ADOR must follow the narrower regulations that it has adopted and has not seen fit to change.

¶ 29 There are good reasons why Arizona law requires administrative agencies to follow their own rules and regulations. Our Administrative Procedure Act ("APA") not only requires the publication of existing agency rules and regulations, *see* A.R.S. §§ 41–1011, –1012, but also the publication of a monthly register concerning "proposed repeals, makings or amendments of rules." A.R.S. § 41–1013 (1999). The APA provides for public notice and comment before the adoption or amendment of agency rules. *See* A.R.S. §§ 41–1021 through –1036 (1999). The APA also requires the filing of an "economic, small business and consumer impact statement," A.R.S. §§ 41–1055 (1999) and 41–1056(A)(6) (Supp.1999) and screening by a governor's regulatory review council before a proposed regulation takes effect. *See* A.R.S. § 41–1051 (Supp.1999); A.R.S. §§ 41–1052 through –1053 (1999). Explaining this process, this court stated, "APA rulemaking re-

quires public notice, and the opportunity for public participation and comment, to ensure that those affected by a rule have adequate notice of the agency's proposed procedures and the opportunity for input into the consideration of those procedures." *Carondelet Health Svcs., Inc. v. Arizona Health Care Cost Containment System Admin.,* 182 Ariz. 221, 226, 895 P.2d 133, 138 (1994).

¶ 30 Through publication of current rules and notice of amendments, an agency not only permits members of the public to comment on impending changes, but also to consult the evolving body of rules and regulations, determine the agency's approach to circumstances that its rules and regulations define, and order their affairs accordingly. And the purpose of permitting the public to order its affairs in accordance with published regulations is particularly keen for tax regulations that govern commercial transactions. When the parties to commercial transactions factor likely taxes into pricing decisions, they should do so in the confidence that the taxing authority will tax as its published regulations say it will tax, and not as it might tax under a different, unproposed, unapproved, and unadopted regulatory scheme.

¶ 31 In consequence, I see no need to embark on the quest for elusive nexus to resolve this case. On the far simpler ground that ADOR has failed to follow its own regulations, I would affirm. Because my colleagues have opened the subject of nexus, however, I will make one further point.

¶ 32 Whatever the substantive validity of Commerce Clause case jurisprudence before *Complete Auto,* the law then had the virtue of clarity. The earlier case law imposed a "blanket prohibition against any state taxation imposed directly on an interstate transaction." *Ante* ¶ 7. In *Complete Auto,* however, the Court made "substantial nexus" the touchstone of taxation of interstate transac-

tions. And in *Tyler Pipe,* the Court defined "sufficient nexus" to include those activities "significantly associated with the taxpayer's ability to establish and maintain a market in [the taxing] state for the sales." *Ante* ¶ 8 (quoting *Tyler Pipe,* 483 U.S. at 250, 107 S.Ct. 2810).

¶ 33 I do not hold the majority responsible for the *Tyler Pipe* standard. They are stuck with it as are we all. To apply that standard to these facts and those of *O'Connor,* however, shows it to add bulk without nourishment to the law. What, other than ad hoc pronouncement, distinguishes an activity significantly associated with the taxpayer's ability to establish and maintain a sales market from an activity not significantly associated with that ability? One is hard pressed to say. The best the court can do is conclude by comparative analysis that, if the attenuated circumstances of *O'Connor* meet that standard, so must the equally attenuated circumstances of this case. And so, validating the taxation of one attenuated transaction after another after another, the courts erode the general standard of substantial nexus into something very insubstantial indeed.

¶ 34 "Substantial nexus" is a swamp we should stay out of in this case. If ADOR amends its regulations to detach sales taxes from the terra firma of the vendor's place of business, there will be time enough to gauge nexus. Until then, we should hold ADOR to regulations on the books.

¶ 35 For the foregoing reasons, I respectfully dissent.