its surety, for which execution may issue if necessary.

ARCO BUILDING SYSTEMS, INC.

v.

Loren L. CHUMLEY et al.

Court of Appeals of Tennessee
at Nashville.

Oct. 12, 2005 Session.

June 12, 2006.

Permission to Appeal Denied by
Supreme Court Oct. 30, 2006.

Michael D. Sontag and Bryan W. Metcalf, Nashville, Tennessee, for the appellant, Arco Building Systems, Inc.

Paul G. Summers, Attorney General and Reporter, and Jimmy G. Creecy, Chief Special Counsel, for the appellee, Loren L. Chumley, Commissioner of Revenue for the State of Tennessee.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

This appeal involves the constitutionality of a sales and use tax assessment against an out-of-state seller of pre-engineered metal buildings. After conducting an audit, the Tennessee Department of Revenue assessed the seller $652,369.68 in uncollected sales and use taxes, penalties, and interest. The seller filed suit in the Chancery Court for Davidson County challenging the assessment on the grounds that it violated the Commerce Clause and the Due Process Clause of the Fourteenth Amendment because the seller did not have a sufficient connection with Tennessee to justify Tennessee's exercise of its taxing authority. Both parties filed motions for summary judgment, and the trial court upheld the assessment. The seller has appealed. We have determined that the seller's extensive connections with Tennessee are sufficient to provide the constitutional nexus required to support the imposition of tax collection liability on the seller.

### I.

Arco Building Systems, Inc. (Arco), a Delaware corporation with its principal place of business in Norcross, Georgia, is in the business of selling single-story metal buildings. Arco does not manufacture the buildings itself. During the time period relevant to this case, it contracted with four manufacturers in Georgia, Louisiana, Tennessee, and Texas to construct the buildings based on its customers' specifications.[1] All of Arco's employees live and

---

1. Arco's four manufacturers during the audit period were: Pascoe Building Systems, Inc.

in Columbus, Georgia; Southern Building Systems in Lafayette, Louisiana; Spirco Man-

work in Georgia. Approximately fifteen percent of Arco's total annual sales are to customers located in Tennessee.

A typical sale is initiated when a customer places a telephone call to Arco's office in Georgia. An Arco employee ascertains the customer's needs and then contacts its manufacturers to determine which one can engineer, manufacture, and ship the building to the customer in the required time for the best price. Arco prepares a quote and faxes it to the customer along with a proposed contract. As a general rule, 70% of the quoted price represents Arco's cost to purchase the building from the manufacturer, and the remaining 30% is Arco's gross profit on the resale to the customer. If the customer decides to proceed with the transaction, he or she signs the contract, returns it to Arco by mail or facsimile, and remits 30% of the purchase price to Arco in Georgia by means of a cashier's check or a wire transfer.

After Arco receives the customer's signed contract and 30% payment, it sends a purchase order to the manufacturer. The manufacturer prepares plans and blueprints and sends them directly to Arco's customer for approval. Once the customer approves the plans and blueprints, the manufacturer proceeds to construct the building and then notifies Arco when the building is ready for shipment. Arco in turn notifies its customer, and the customer contacts the manufacturer di-

rectly to coordinate shipment of the building by common carrier. If problems arise, the customer contacts Arco. If Arco cannot resolve a problem on its own, it contacts the manufacturer that constructed the building. If replacement parts are needed, the manufacturer sends them directly to the customer by mail or common carrier.

Arco does not pay its manufacturers on the front end. Instead, on delivery of the building to Arco's customer, the customer gives the common carrier a cashier's check made out to Arco for the remaining 70% of the purchase price. The common carrier forwards the cashier's check to the manufacturer, and the manufacturer cashes it with a power of attorney granted by Arco. Arco and its manufacturers periodically reconcile their accounts, and when the cashier's checks cashed by a manufacturer for the reconciliation period exceed the amount Arco owes the manufacturer for the buildings, the manufacturer sends the overpayment to Arco in Georgia. Conversely, when the cashier's checks cashed by the manufacturer for the period fall short, Arco sends the manufacturer funds to cover the underpayment. Once a building has been constructed, Arco must pay for it even if its customer ultimately reneges on the deal.

■■■ Tennessee imposes a tax on the "sale at retail" and "use" of all tangible personal property in the state.[2] In 1994, Arco registered with the Tennessee De-

---

ufacturing in Memphis, Tennessee; and NCI Building Systems in Houston, Texas. Arco's Georgia manufacturer has since gone out of business.

**2.** Retailers' Sales Tax Act, Tenn.Code Ann. §§ 67–6–101 to –907 (2003 & Supp.2005). Use taxes are designed to "prevent[ ] evasion of the sales tax through importation of property from without the state" for use within the state. *United States v. Boyd*, 211 Tenn. 139, 161, 363 S.W.2d 193, 203 (Tenn.1962), *aff'd*, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713

(1964); *accord Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 193–94, 115 S.Ct. 1331, 1342–43, 131 L.Ed.2d 261 (1995), *superseded by statute*, ICC Termination Act of 1995 § 3, Pub.L. No. 104–88, 109 Stat. 803, 904 (codified at 49 U.S.C.A. § 14505 (1997)); *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 32, 108 S.Ct. 1619, 1624, 100 L.Ed.2d 21 (1988). Thus, all forty-five states that impose a sales tax levy also impose a corresponding use tax on property purchased out of state that is used or consumed in state. 2 JEROME

partment of Revenue as a "dealer" for sales and use tax purposes.[3] By that time, Arco's four manufacturers had already registered as Tennessee dealers. Arco's registration as a Tennessee dealer enabled Arco to issue blanket certificates of resale to its manufacturers exempting them from the obligation to collect and remit Tennessee sales and use taxes on the buildings they manufactured and shipped to Arco's customers in Tennessee.[4] Accordingly, Arco's manufacturers reported no tax liability on their annual Tennessee sales and use tax returns in connection with their sales to Arco.[5] Had Arco not issued them blanket certificates of resale, the manufacturers would have collected sales or use taxes on the buildings they constructed and sold to Arco for resale to customers in Tennessee.

Arco did not report any of its sales to persons located in Tennessee on the annual sales and use tax returns it filed with the Department for the years 1995 through 2001. An audit ensued, and the Department made an assessment against Arco of $652,369.68 for its Tennessee sales between December 1, 1994 and December 31, 1997. This figure included $454,433.00 in use taxes Arco failed to collect and remit on its Tennessee sales, plus $152,491.68 in interest and a $45,445.00 penalty. At Arco's request, the Department conducted an informal review of the assessment and ultimately stood by its previous determination.

On August 9, 1999, Arco filed a complaint in the Chancery Court for Davidson County challenging the assessment.[6] Arco

R. Hellerstein & Walter Hellerstein, State Taxation ¶¶ 12.01, at 12–5, 16.01 n. 15, at 16–4, 18.08, at 18–100 (3rd ed. 2002 & Supp. 2005) (Hellerstein & Hellerstein; *see Pearle Health Servs., Inc. v. Taylor*, 799 S.W.2d 655, 657 (Tenn.1990) ("The Sales and Use Tax Act comprehensively imposes tax on the privileges of selling goods at retail in Tennessee or purchasing goods out of state for use in Tennessee. If the consumption of goods has occurred in the State of Tennessee then a tax liability has accrued.") To avoid multiple taxation of the same transaction, use taxes generally apply only to the extent that the sale has otherwise escaped taxation, and forty-four of the forty-five states that impose sales and use taxes permit an exemption or credit for similar taxes paid to other states. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. at 193–94, 115 S.Ct. at 1343. The United States Supreme Court has instructed that in its view, the constitutionality of compensatory use taxes in general is "settled." *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 555, 97 S.Ct. 1386, 1389, 51 L.Ed.2d 631 (1977); *see Henneford v. Silas Mason Co.*, 300 U.S. 577, 581, 57 S.Ct. 524, 526, 81 L.Ed. 814 (1937); *Monamotor Oil Co. v. Johnson*, 292 U.S. 86, 93, 54 S.Ct. 575, 578, 78 L.Ed. 1141 (1934).

**3.** Tenn.Code Ann. § 67–6–102(a)(11)(C) defines a "dealer" as anyone who:

Sells at retail, or who offers for sale at retail, or who has in such person's possession for sale at retail, or for use, consumption, distribution, or storage to be used or consumed in this state, tangible personal property.

**4.** The Retailers' Sales Tax Act excludes sales for resale from the definition of a taxable "sale at retail" or "[r]etail sale." Tenn.Code Ann. § 67–6–102(a)(28)(A); *see SC & T Props. v. Huddleston*, 823 S.W.2d 541, 543 (Tenn. 1992).

**5.** Arco's four manufacturers also filed Tennessee franchise and excise tax returns for the years involved in this appeal.

**6.** Arco's complaint contains a typographical error regarding the amount of the assessment. It asserted that the amount of the assessment was $652,369.86 when, in fact, it was $652,369.68. This error made its way safely through the entire case and into the court's final judgment. On remand, the trial court should enter an order correcting the final judgment to reflect that the assessment against Arco was $454,433.00 in unpaid taxes plus $152,491.68 in interest and a $45,455.00 penalty for a total of $652,369.68.

claimed that the assessment violated the Commerce Clause and the Due Process Clause of the Fourteenth Amendment. Arco alleged that it owned no real or personal property in Tennessee, maintained no office or other place of business in the state, and had no Tennessee employees and that its only connections with its Tennessee customers were by mail or common carrier. Arco asserted that under the controlling United States Supreme Court precedents, these contacts were legally insufficient to support the assessment.

The parties filed cross-motions for summary judgment accompanied by similar statements of the undisputed material facts. Following a hearing, the trial court entered a July 9, 2004 order granting the State's summary judgment motion and denying Arco's motion. The court concluded that the material facts were not subject to genuine dispute and that the undisputed facts showed that Arco had the necessary "physical presence" in Tennessee and resulting "substantial nexus" required to support the imposition of use tax collection liability.

In support of its conclusion, the court cited Arco's use of the Tennessee manufacturer as a de facto representative and extensive participant in its Tennessee business operations to engineer, manufacturer, and distribute the buildings Arco sold to its customers in Tennessee and elsewhere. The court also mentioned Arco's registration as a Tennessee dealer, its filing of annual Tennessee sales and use tax returns, and its print advertising in two publications circulated in Tennessee. The court determined that the State was the prevailing party but reserved a ruling on the amount of the attorney's fees and costs due pending the outcome of any appeals. The court directed that its ruling be entered as a final judgment subject to immediate appeal under Tenn. R. Civ. P. 52.04. Arco appealed.

## II.

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn.1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn.Ct.App.2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted when the undisputed facts, as well as the inferences reasonably drawn from the undisputed facts, support only one conclusion—that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn.2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn.2001).

The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn.2002); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn.1998). When the moving party is the defendant, it is entitled to a judgment as a matter of law only when it affirmatively negates an essential element of the non-moving party's claim or establishes an affirmative defense that conclusively defeats the non-moving party's claim. *Byrd v. Hall*, 847 S.W.2d at 215 n. 5; *Cherry v. Williams*, 36 S.W.3d 78, 82–83 (Tenn.Ct.App.2000).

Summary judgments enjoy no presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn.2003); *Scott v. Ash-*

land Healthcare Ctr., Inc., 49 S.W.3d 281, 285 (Tenn.2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49, 50–51 (Tenn.1997). We must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Godfrey v. Ruiz,* 90 S.W.3d at 695; *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001).

When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall,* 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn. Ct.App.1998).

The parties agree that the trial court properly determined that the facts material to this dispute are not subject to genuine dispute. Having carefully reviewed the record on appeal, we agree with the trial court's assessment of the evidence. Accordingly, this case is an appropriate one for resolution by summary judgment, and the sole issue on appeal is whether the trial court erred in concluding that on these facts, it is the State rather than Arco that is entitled to a judgment as a matter of law.

### III.

The narrow constitutional question presented by this appeal is whether Arco's connections with Tennessee are sufficient to support the imposition of a use tax

collection responsibility under the Commerce Clause.[7] Arco contends that the undisputed facts demonstrate that it lacks the "physical presence" in Tennessee and resulting "substantial nexus" with the state required by the governing case law. *Quill Corp. v. North Dakota,* 504 U.S. 298, 314, 112 S.Ct. 1904, 1914, 119 L.Ed.2d 91 (1992); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977). Accordingly, we turn first to an examination of the requirements of the Commerce Clause as construed by the United State Supreme Court before determining whether the trial court properly applied the relevant precedents in upholding the assessment against Arco.

### A.

The Commerce Clause provides in part that "Congress shall have Power . . . To regulate Commerce . . . among the several States. . . ." U.S. Const. art. I, § 8, cl. 3. The central purpose of the Commerce Clause was to foster the creation of a national economy and to protect the national economy from unjustifiable interference by the states. *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. at 179–80, 115 S.Ct. at 1335–36; *Nat'l Bellas Hess, Inc. v. Dep't of Revenue,* 386 U.S. 753, 760, 87 S.Ct. 1389, 1393, 18 L.Ed.2d 505 (1967). Although the text of the Commerce Clause contains only an affirmative grant of authority to Congress to regulate interstate commerce, the Court has long interpreted it to include an implied limitation on the power of the states to do the same. *South Carolina State Highway Dep't v. Barnwell Bros., Inc.,* 303 U.S. 177, 184–85 & n. 2, 58 S.Ct. 510, 513–14 & n. 2, 82 L.Ed. 734 (1938); *Gibbons v. Ogden,* 22 U.S. (9

---

**7.** Arco has abandoned its claim that the assessment violates its rights under the Due

Process Clause of the Fourteenth Amendment.

Wheat.) 1, 222–40, 6 L.Ed. 23 (1824) (Johnson, J., concurring).

■ The implied limitation on state regulatory power even in the absence of congressional action is known as the "negative" or "dormant" aspect of the Commerce Clause. *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997); *Barclays Bank PLC v. Franchise Tax Bd.,* 512 U.S. 298, 311 n. 9, 114 S.Ct. 2268, 2276 n. 9, 129 L.Ed.2d 244 (1994). It is well established that the dormant aspect of the Commerce Clause applies to the states' power to tax. *Case of the State Freight Tax,* 82 U.S. (15 Wall.) 232, 280, 21 L.Ed. 146 (1872); *Woodruff v. Parham,* 75 U.S. (8 Wall.) 123, 137–38, 19 L.Ed. 382 (1868).[8] However, the Court has long struggled to develop an adequate framework for analyzing dormant Commerce Clause challenges to state tax legislation.[9]

The Court first articulated its modern approach almost thirty years ago in *Complete Auto Transit, Inc. v. Brady.* In that case, the Court "abandoned the abstract notion that interstate commerce 'itself' cannot be taxed by the States" and "recognized that, with certain restrictions, interstate commerce may be required to pay its fair share of state taxes." *D.H. Holmes Co. v. McNamara,* 486 U.S. at 30–31, 108 S.Ct. at 1623.[10] The Court synthesized selected principles from its prior case law and announced that henceforth, state taxes would be upheld against challenges under the dormant Commerce Clause as long as: (1) the tax was applied to an activity that had a "substantial nexus" with the taxing state; (2) the tax was "fairly apportioned;" (3) the tax did not "discriminate against interstate commerce;" and (4) the tax was "fairly related" to the services provided by the taxing state. *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. at 1079. Following the *Complete Auto Transit* decision, the Court has consistently applied this four-part analysis to determine the constitutionality of a wide variety of state tax laws,[11] including those involving sales or use taxes.[12] HELLERSTEIN & HELLERSTEIN ¶ 4.1, at 4–47.

8. *See Quill Corp.,* 504 U.S. at 312, 112 S.Ct. at 1913 ("Under the Articles of Confederation, state taxes and duties hindered and suppressed interstate commerce; the Framers intended the Commerce Clause as a cure for these structural ills.").

9. For an excellent review of the evolution of the Court's dormant Commerce Clause jurisprudence as it relates to the states' tax power, see BORIS I. BITTKER & BRANNON P. DENNING, BITTKER ON THE REGULATION OF INTERSTATE AND FOREIGN COMMERCE §§ 8.01–8.14, 8–1 to 8–52 (1999 & Supp.2006) (BITTKER).

10. *See Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938) ("It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of [the] state tax burden even though it increases the cost of doing business.").

11. *See, e.g., Goldberg v. Sweet,* 488 U.S. 252, 259–60, 109 S.Ct. 582, 587–88, 102 L.Ed.2d 607 (1989) (telecommunications tax); *Commonwealth Edison Co. v. Montana,* 453 U.S. at 617, 101 S.Ct. at 2953 (mineral severance tax); *Mobil Oil Co. v. Comm'r of Taxes,* 445 U.S. 425, 443–44, 100 S.Ct. 1223, 1234–35, 63 L.Ed.2d 510 (1980) (corporate income tax); *Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos.,* 435 U.S. 734, 745–50, 98 S.Ct. 1388, 1396–99, 55 L.Ed.2d 682 (1978) (business and occupation tax).

12. *See, e.g., Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. at 183, 115 S.Ct. at 1337 (sales tax); *Quill Corp.,* 504 U.S. at 311, 112 S.Ct. at 1912 (use tax); *D.H. Holmes Co. v. McNamara,* 486 U.S. at 30–31, 108 S.Ct. at 1623 (use tax); *Wardair Canada, Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 8, 106 S.Ct. 2369, 2373, 91 L.Ed.2d 1 (1986) (sales tax); *Maryland v. Louisiana,* 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981) (use tax).

The decision to craft a new test for dormant Commerce Clause challenges to state tax laws was prompted largely by the hopeless disarray of the Court's existing precedents in this area. *See Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457–58, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959) (describing the Court's dormant Commerce Clause cases relating to the states' tax power alternately as a "tangled underbrush" and a "quagmire"). In *Complete Auto Transit,* the Court recognized that the new four-part test it was adopting conflicted with much of its prior case law. *See United States v. IBM Corp.,* 517 U.S. 843, 851, 116 S.Ct. 1793, 1799, 135 L.Ed.2d 124 (1996) (noting the Court's "rejection in *Complete Auto* of much of our early dormant Commerce Clause jurisprudence"). However, the Court overruled only two prior decisions, *Freeman v. Hewit,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946), and *Spector Motor Serv., Inc. v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951). *Complete Auto Transit,* 430 U.S. at 288–89, 97 S.Ct. at 1084; *see also Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175 at 183, 115 S.Ct. at 1337, 131 L.Ed.2d 261. Thus, while the Court substantially clarified the basic test for dormant Commerce Clause challenges to state tax legislation, it provided scant guidance to future courts in grappling with the difficult question of how much of the Court's extensive [13] prior case law in this area had been effectively overruled.

### B.

One of the prior decisions called into doubt by *Complete Auto Transit* was *National Bellas Hess, Inc. v. Dep't of Revenue,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). The case involved an attempt by the State of Illinois to require the mail-order division of a large apparel company to collect and remit use taxes on goods it sold and delivered to customers in Illinois. The company, which was incorporated in Delaware and had its principal place of business in Missouri, did not maintain an "office, distribution house, sales house, warehouse or any other place of business" in Illinois, had no "agent, sales[person], canvasser, solicitor or other type of representative to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise" in Illinois, and did not "own any tangible property, real or personal, in Illinois." *Nat'l Bellas Hess,* 386 U.S. at 754, 87 S.Ct. at 1390.

The company did not advertise its merchandise for sale in newspapers, on billboards, or by radio or television in Illinois. Instead, the mail-order division sent catalogues twice yearly, as well as occasional flyers, to the company's recent customers throughout the country, including some who lived in Illinois. Customers in Illinois and elsewhere would mail their orders to the company's plant in Missouri, and the merchandise was then shipped directly from the Missouri plant to the customer by mail or common carrier. In spite of its seemingly minimal efforts to exploit the Illinois consumer market, the mail-order division racked up over two million dollars in Illinois sales over a fifteen-month period in 1961 and 1962. After the company failed to collect and remit use taxes on its Illinois sales as required by state law, the Illinois Department of Revenue made a $95,000 assessment against the company for the unpaid use taxes. The Illinois Supreme Court upheld the assessment,

---

**13.** By 1959, the Court had already "handed down some three hundred full-dress opinions spread through slightly more than that number of our reports" involving the states' tax power. *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. at 457–58, 79 S.Ct. at 362.

and the seller appealed to the United States Supreme Court.

The Court acknowledged that it had previously upheld the states' power to impose sales or use tax collection responsibilities on out-of-state sellers in a wide variety of circumstances but noted that it had "never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail." *Nat'l Bellas Hess*, 386 U.S. at 758, 87 S.Ct. at 1392. The Court claimed that it had drawn a "sharp distinction" in its prior decisions between "mail order sellers with retail outlets, solicitors, or property within a State, and those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business." *Nat'l Bellas Hess*, 386 U.S. at 758, 87 S.Ct. at 1392.

The Court was concerned about the impact the removal of this distinction might have on the nation's mail-order catalogue industry. The Court cited a congressional finding that as of 1965, there were more than 2,300 local taxing jurisdictions in the United States, and worried that "[t]he many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements could entangle [a mail-order seller's] interstate business in a virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose 'a fair share of the cost of the local government.'" *Nat'l Bellas Hess*, 386 U.S. at 759–60, 87 S.Ct. at 1393 (footnotes omitted). The Court struck down the Illinois use tax assessment on the basis of the dormant Commerce Clause and the Fourteenth Amendment's Due Process Clause.

Fifteen years after the *Complete Auto Transit* decision, and twenty-five years after *National Bellas Hess*, the Court finally took up the question whether the adoption of the modern four-part test for evaluating dormant Commerce Clause challenges to state tax laws had effectively overruled the decision in *National Bellas Hess*. *Quill Corp.*, 504 U.S. at 301–02, 112 S.Ct. at 1907. This case arose out of the State of North Dakota's attempt to require a large out-of-state seller of office equipment and supplies to collect and remit use taxes on products sold and delivered to customers in North Dakota. The seller, a Delaware corporation with offices and warehouses in Illinois, California, and Georgia, owned no real or personal property in North Dakota, had no place of business there, and had no North Dakota employees. The seller solicited customers through catalogues and flyers sent in the mail, telemarketing calls, and advertisements in national periodicals. As in *National Bellas Hess*, the seller filled all its North Dakota orders outside the state and then shipped the orders to its North Dakota customers by interstate mail or common carrier. The seller did not collect and remit use taxes on its North Dakota sales as required by state law.

North Dakota filed suit against the seller in state court to collect the unpaid use taxes plus interest and penalties. The trial court granted summary judgment in favor of the State, and the seller appealed to the North Dakota Supreme Court. The State argued that since 1967, the increased integration of the national economy, innovations in computer technology that had eased the burdens of complying with diverse state tax laws, and the evolution of the United States Supreme Court's Fourteenth Amendment Due Process Clause and dormant Commerce Clause jurisprudence had combined to render the rule of *National Bellas Hess* obsolete. The North Dakota Supreme Court agreed, and the United States Supreme Court granted

certiorari to determine the continuing vitality of *National Bellas Hess* in light of *Complete Auto Transit* and its progeny.

The Court agreed with North Dakota that developments in its Due Process Clause jurisprudence over the past twenty-five years had fatally undermined the due process foundation for the holding in *National Bellas Hess*. The Court noted that in the intervening years, it had explicitly rejected earlier, more formalistic tests for personal jurisdiction focusing on a defendant's "presence" within the forum state in favor of a more flexible inquiry into whether the defendant's contacts with the state made it reasonable, in our federalist system, to require him or her to defend a suit there. The Court pointed out that it had expressly held under the Due Process Clause that "if a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State." *Quill Corp.*, 504 U.S. at 307, 112 S.Ct. at 1910; *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) ("Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State.").

However, the Court reached a different conclusion with respect to the dormant Commerce Clause basis for the decision in *National Bellas Hess*. The Court acknowledged that its recent dormant Commerce Clause decisions had "signaled a retreat from the formalistic constrictions of a stringent physical presence test in favor of a more flexible substantive approach" and even conceded that if the factual scenario presented in *National Bellas Hess* had come before the Court in 1992 rather than 1967, the case might well have been decided the other way as a result of *Complete Auto Transit* and its progeny. *Quill Corp.*, 504 U.S. at 314, 112 S.Ct. at 1914.[14] Nevertheless, the Court declined North Dakota's invitation to overrule *National Bellas Hess* outright and instead reaffirmed "the continuing vitality of its 'sharp distinction ... between mail-order sellers with [a physical presence in the taxing] State and those ... who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business.'" *Quill Corp.*, 504 U.S. at 311, 112 S.Ct. at 1912 (alterations in original).

The Court cited several reasons for its decision to preserve the *National Bellas Hess* safe harbor from state tax law obligations. First, after canvassing its recent dormant Commerce Clause decisions, the Court concluded that the "physical presence" requirement of *National Bellas Hess* could be engrafted, if somewhat awkwardly, onto the "substantial nexus" prong of the *Complete Auto Transit* test. *See Quill Corp.*, 504 U.S. at 309–16, 112 S.Ct. at 1911–15.[15] Second, the Court claimed that the "bright-line rule" of *National Bellas Hess* "furthers the ends of the dormant Commerce Clause ... by the demarcation

---

14. *See also Quill Corp.*, 504 U.S. at 320–21, 112 S.Ct. at 1916 (Scalia, J., concurring in part and concurring in the judgment) ("It seems to me important that we retain our ability ... sometimes to adopt new principles for the resolution of new issues without abandoning clear holdings of the past that those principles contradict. We seemed to be doing that in this area.").

15. *Compare Complete Auto Transit*, 430 U.S. at 279, 97 S.Ct. at 1079 (requiring courts to examine the connections between the taxing state and the *activity* taxed) *with Quill Corp.*, 504 U.S. at 315, 112 S.Ct. at 1914 (examining the connections between the taxing state and the *entity* subjected to the use tax collection responsibility) *and Nat'l Bellas Hess*, 386 U.S. at 758, 87 S.Ct. at 1392 (same).

of a discrete realm of commercial activity that is free from interstate taxation." *Quill Corp.*, 504 U.S. at 314–15, 112 S.Ct. at 1914. Third, the Court noted that the doctrine of stare decisis counseled adherence to *National Bellas Hess*, especially in light of the substantial reliance the rule of that case had engendered in the nation's mail-order catalogue industry. *Quill Corp.*, 504 U.S. at 317, 112 S.Ct. at 1916 (observing that the safe harbor created by *National Bellas Hess* "has become part of the basic framework of a sizable industry"). Accordingly, the Court reaffirmed the "physical presence" requirement of *National Bellas Hess* as a component of the "substantial nexus" prong of the *Complete Auto Transit* test for dormant Commerce Clause challenges to state sales and use tax laws.[16]

## C.

■ Arco insists that the undisputed facts place this case squarely within the rule of *National Bellas Hess* and *Quill Corp.* Arco emphasizes that like the out-of-state sellers in *National Bellas Hess* and *Quill Corp.*, Arco itself owns no real or personal property in the taxing state, maintains no office, plant, or warehouse here, and has no in-state employees.

Thus, Arco contends that, just as in *National Bellas Hess* and *Quill Corp.*, its "only connection with customers in the State is by common carrier or the United States mail." *Quill Corp.*, 504 U.S. at 301, 112 S.Ct. at 1907 (*quoting Nat'l Bellas Hess*, 386 U.S. at 758, 87 S.Ct. at 1392). Arco claims that the trial court erred by improperly considering its use of a local manufacturer, registration as a Tennessee dealer, and filing of annual state sales and use tax returns in concluding that it has the necessary "physical presence" in Tennessee.

■ As Arco implicitly recognizes, the "physical presence" inquiry is highly fact-driven.[17] However, we see little similarity between the facts of this case and those confronted by the Court in *National Bellas Hess* and *Quill Corp.* In both *National Bellas Hess* and *Quill Corp.*, the goods subject to the use tax were manufactured wholly outside the taxing state and shipped directly to in-state customers by *interstate* mail or common carrier. In addition, in *National Bellas Hess*, the Court noted that the out-of-state seller did not have any "agent . . . or other type of representative . . . to accept payments" in the

16. The Court emphasized that its removal of the Due Process Clause underpinning for the rule of *National Bellas Hess* left Congress free to modify or entirely repudiate the rule through the enactment of ordinary legislation in the exercise of its plenary authority over interstate commerce under the Commerce Clause. *Quill Corp.*, 504 U.S. at 305, 112 S.Ct. at 1909 ("Congress has plenary power to regulate commerce among the States and thus may authorize state actions that burden interstate commerce."); *see also Quill Corp.*, 504 U.S. at 320, 112 S.Ct. at 1916 (Scalia, J., concurring in part and concurring in the judgment) ("Congress has the final say over regulation of interstate commerce, and it can change the rule of [*National*] *Bellas Hess* by simply saying so."). Thus far, Congress has not taken up the Court's invitation to pass

legislation specifying "whether, when, and to what extent the States may burden interstate mail-order concerns with a duty to collect use taxes." *Quill Corp.*, 504 U.S. at 318, 112 S.Ct. at 1916.

17. *See, e.g., Quill Corp.*, 504 U.S. at 307, 313–14, 112 S.Ct. at 1910, 1914 (suggesting that the "presence in the taxing State of a small sales force, plant, or office" would be sufficient to constitute a "physical presence" in the taxing state while inclusion of a "subscription card in three issues of [a] magazine," "radio advertisements heard in [the taxing state] on three occasions," and the use of a "telephone sales force [to] ma[k]e three calls into the [taxing] State" would not).

taxing state. *Nat'l Bellas Hess*, 386 U.S. at 754, 87 S.Ct. at 1390.

In this case, by contrast, a significant number of the buildings subject to the use tax were engineered and manufactured in the taxing state and shipped to the seller's in-state customers by intrastate, not interstate, common carrier.[18] Moreover, Arco has specifically authorized an in-state company to accept and deposit final payments from its customers. The in-state company is involved in Arco's Tennessee operations from beginning to end in the preparation of price quotes to drawing up blueprints to fabricating the product to arranging for shipment of the product to accepting final payment from the customer. The in-state company even provides post-delivery consulting services when problems arise and ships replacement parts, if necessary, by *in-state* mail or common carrier. Thus, unlike the sellers in *National Bellas Hess* and *Quill Corp.*, this case involves an out-of-state seller that has chosen to rely heavily on an in-state company to perform a wide range of services that are integral to the success of the seller's overall business operations in the taxing state.

We reject Arco's contention that it is improper to consider the actions of the in-state company in determining whether Arco itself has a "physical presence" in Tennessee.[19] In *Quill Corp.*, the Court used the phrase "physical presence" as a term of art to describe the connections it had previously found sufficient to support the imposition of state sales and use tax obligations on out-of-state companies. The Court has rejected the notion that only the

acts of an out-of-state corporate seller's officers, directors, employees, or regular agents are relevant to the "physical presence" determination and has expressly upheld the imposition of state sales and use tax obligations based on an out-of-state seller's use of non-employee representatives who are not regular agents to conduct business activities in the taxing state. *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 249–51, 107 S.Ct. 2810, 2821–22, 97 L.Ed.2d 199 (1987); *Scripto, Inc. v. Carson*, 362 U.S. at 209–13, 80 S.Ct. at 620–22.

As this court has previously explained, "a substantial nexus may be established by activities carried on within the state *by affiliates and independent contractors*," and the fact that the out-of-state seller owns no real or personal property in the state and has no in-state employees or place of business is therefore not dispositive. *America Online, Inc. v. Johnson*, No. M2001–00927–COA–R3–CV, 2002 WL 1751434, at *3 (Tenn.Ct.App. July 30, 2002) (No Tenn. R.App. P. 11 application filed) (emphasis added). The critical issue is whether substantial business activities "ha[ve] been carried on in the taxing state *on the taxpayer's behalf.*" *America Online, Inc. v. Johnson*, 2002 WL 1751434, at *2; *see also Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. at 249, 107 S.Ct. at 2821; *Scripto, Inc. v. Carson*, 362 U.S. at 211–12, 80 S.Ct. at 622 ("The test is simply the nature and extent of the activities of the [seller] in Florida [i.e., the taxing state].")). Thus, the trial court did not err in considering Arco's use

---

**18.** *Cf. Scripto, Inc. v. Carson*, 362 U.S. 207, 211, 80 S.Ct. 619, 621, 4 L.Ed.2d 660 (1960) ("The only incidence of this sales transaction that is nonlocal is the acceptance of the order.").

**19.** Arco "itself" is a corporation, a legal construct designed to facilitate commerce. Thus,

technically speaking, it does not have a "physical presence" anywhere. Reliance on such a rigidly literal interpretation of the phrase "physical presence" would plainly be at odds with the Court's case law in this area, including its decision in *Quill Corp.*

of the in-state manufacturer in determining that Arco has a "physical presence" in Tennessee. Moreover, we agree with the trial court that the facts of this case place Arco well beyond the narrow safe harbor of *National Bellas Hess* and *Quill Corp.* Accordingly, the trial court did not err in sustaining the assessment.[20]

An additional basis for upholding the trial court's "physical presence" determination is Arco's deliberate manipulation of Tennessee's tax laws to shield not only itself, but also its four manufacturers, from the requirement to collect and remit Tennessee sales and use taxes on the buildings at issue. Arco insists that an out-of-state seller does not automatically forfeit its dormant Commerce Clause immunity from state tax obligations by taking the rational prophylactic steps of registering as a dealer and filing annual returns in all states where it might be subject to sales or use tax liability. Whatever the merits of this argument, it is irrelevant here, for Arco did not simply register as a Tennessee dealer and file annual sales and use tax returns reporting no tax liability. Arco also relied on its Tennessee registration to issue blanket certificates of resale to keep its manufacturers, one of which was located in Tennessee, from charging Tennessee sales or use taxes on the buildings they sold to Arco or shipped to Arco's customers in Tennessee.

Arco took steps in Tennessee with the Department of Revenue to set up a double exemption from Tennessee sales and use taxes. Arco registered as a Tennessee dealer and issued Tennessee blanket certificates of resale to its manufacturers to avoid paying them Tennessee sales or use taxes on the buildings it purchased from them on the front end, while at the same time relying on the *National Bellas Hess/Quill Corp.* safe harbor to justify its failure to collect and remit Tennessee use taxes on its sales to customers in the state on the back end. It is one thing for an out-of-state seller to take advantage of the *National Bellas Hess/Quill Corp.* safe harbor to protect itself from the potentially ruinous costs of attempting to comply with forty-five different state sales and use tax schemes when it has only the most attenuated connection with many or all of the taxing states. It is another thing entirely for an out-of-state seller to attempt to manipulate the interaction between the *National Bellas Hess/Quill Corp.* safe harbor and an individual state's sales and use tax laws to excuse itself from paying taxes on both its purchases from and sales into the taxing state simply to increase its profits or secure a competitive advantage in the marketplace. Nothing in the Court's case law suggests that the dormant Commerce Clause should be interpreted to strip states of the power to protect themselves and their tax bases from such deliberate manipulation in the name of protecting the national economy.

### IV.

We affirm the trial court's July 9, 2004 final judgment in favor of the State and remand the case for further proceedings consistent with this opinion. We tax the costs of this appeal to Arco Building Systems, Inc. and its surety for which execution, if necessary, may issue.

---

**20.** Arco did not challenge the assessment on the ground that it was not fairly apportioned, that it discriminated against interstate commerce, or that it was not fairly related to the services provided by the taxing state. *Complete Auto Transit*, 430 U.S. at 279, 287, 97 S.Ct. at 1079, 1083.