NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROCKAUTO, LLC, *Plaintiff/Appellee,*

*v.*

ARIZONA DEPARTMENT OF REVENUE, *Defendant/Appellant.*

No. 1 CA-TX 23-0002
FILED 04-02-2024

Appeal from the Arizona Tax Court
No. TX2020-000778
The Honorable Sara J. Agne, Judge

**REVERSED AND REMANDED WITH DIRECTIONS**

COUNSEL

Frazer, Ryan, Goldberg & Arnold, LLP, Phoenix
By Douglas S. John, James M. Cool
*Co-Counsel for Plaintiff/Appellee*

Husch Blackwell, LLP, Phoenix
By Anthony J. Anzelmo
*Pro Hac Vice Co-Counsel for Plaintiff/Appellee*

Arizona Attorney General's Office, Phoenix
By Scot G. Teasdale
*Counsel for Defendant/Appellant*

_____

**MEMORANDUM DECISION**

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Maria Elena Cruz joined.

_____

**B A I L E Y,** Judge:

¶1        RockAuto, LLC ("RockAuto") is an online auto parts retailer based in Wisconsin.  The Arizona Department of Revenue ("ADOR") assessed a transaction privilege tax on RockAuto's sales to Arizona customers between April 1, 2013, and April 30, 2019 ("the audit period").  RockAuto contended the tax was unlawful because its business activities did not create a substantial nexus to Arizona.  The tax court granted summary judgment in favor of RockAuto and denied ADOR's motion for summary judgment on the substantial nexus question.  Because we determine that there are no genuine issues of material fact and RockAuto's activities established a substantial nexus in Arizona, we vacate the judgment and award of attorneys' fees and costs, and remand to the tax court for entry of summary judgment in favor of ADOR on the substantial nexus issue and to address the other issues in RockAuto's complaint.[1]

**FACTS AND PROCEDURAL HISTORY**

¶2        During the audit period, RockAuto contracted with distributors,[2] six of whom were in Arizona, that supplied inventory, shipped orders, and processed returns for RockAuto.  About 11% of orders placed with Arizona distributors shipped to Arizona customers, and

_____

[1] RockAuto's complaint also alleged that the assessment overstated the gross income attributable to RockAuto and that ADOR should abate the penalties because RockAuto acted reasonably.  The tax court granted summary judgment for RockAuto on the substantial nexus issue, so we address only that issue here.

[2] The parties disagree on what to call RockAuto's distributors.  RockAuto argues they are its "suppliers," while ADOR argues they are RockAuto's "affiliates."  We refer to the contractors as distributors because they did more than supply products and "affiliate" has a statutory meaning that does not apply here.  *See* Ariz. Rev. Stat. ("A.R.S.") § 42-5043(H) (defining "affiliated person").

slightly more than 80% of orders placed by Arizona customers shipped from outside Arizona.

¶3        RockAuto did not maintain its own inventory. Instead, RockAuto required its distributors to send RockAuto daily inventory lists, and RockAuto listed the distributors' products on its website. Customers placed orders through RockAuto's website, and RockAuto forwarded the orders to its distributors.

¶4        RockAuto's contracts required the distributors to comply with RockAuto's shipping and return policies.[3] The distributors had to use RockAuto's software, which printed shipping labels listing RockAuto's name with the distributor's address.[4] RockAuto also required its distributors to package RockAuto's orders using RockAuto's branded tape, include a RockAuto promotional magnet, and ship the orders directly to customers by mail or common carrier. RockAuto paid for the tape, magnets, and packing boxes. RockAuto suffered the loss if in-transit packages were lost or stolen. If customers returned products, RockAuto provided return labels that had RockAuto's name with the distributor's address.

¶5        RockAuto chose which distributor and location fulfilled customers' orders.[5] RockAuto considered multiple factors but prioritized

---

[3] The record contains five of the six Arizona distributors' contracts, but only four are legible.

[4] RockAuto's president said the distributors were not required to use the shipping software and, if the distributor did not use RockAuto's software, the label had the distributor's name and address. But the four legible contracts required distributors to use the software.

[5] The tax court's minute entry states that "RockAuto does not at all control whether an Arizona customer is served by an Arizona supplier (an independent contractor with RockAuto) or one of its other network of suppliers." This is incorrect. The tax court was citing ADOR's controverting statement of facts, which appears to show a customer could select a different part or brand that could ship from the same location as the other parts in the customer's order. But nothing in the record indicates a customer could manually select the location a certain part shipped from, the parties agreed in their statements of facts to the superior court that "RockAuto chose a warehouse" that would fulfill the order, and the parties agreed at oral argument that customers did not choose which distributor fulfilled his or her order.

"getting the customer his part quickly, getting him a reasonable shipping cost, [and] having it be the right part." If a customer's online cart contained multiple items, the customer could see if the products would ship from different warehouses. But RockAuto did not disclose the warehouse's location or that it used distributors to fulfill orders. RockAuto's website also allowed customers to select different brands of the same part and then click "Choose for Me to Minimize Cost," and RockAuto's system selected the brand that would ship with the other products for the "lowest total cost."

¶6　　　　Customers were responsible for all shipping costs, and customers complained if shipping was expensive or took too long. RockAuto advertised that its prices were lower than its competitors' prices, and having distributors ship directly to customers was less expensive than reshipping orders from Wisconsin. RockAuto's president said RockAuto chose distributors based on inventory and "whether [it had] a facility that is suitable for e-commerce" and that location was not a factor. But he also said shipping times were lower when Arizona distributors shipped orders to Arizona customers and that shipping costs were "related to the distance."

¶7　　　　RockAuto did not want to compete with its distributors; so, its contracts prevented the distributors from selling products directly to consumers through the distributor's website, a website the distributor controlled, or a third-party's website. RockAuto helped its distributors resolve ongoing issues with inventory, orders, and RockAuto's software. During the audit period, RockAuto employees made four one- to two-day business trips to Arizona to meet with distributors.

¶8　　　　RockAuto did not pay transaction privilege taxes during the audit period. *See* A.R.S. § 42-5061 (imposing transaction privilege taxes on the gross proceeds of retail sales). The Town of Gilbert audited RockAuto after a customer brought a RockAuto package to Gilbert's tax department and "complain[ed] that they were not charged tax." In 2019, ADOR issued RockAuto a Notice of Proposed Assessment of more than $8 million, which included tax, interest, and penalties.

¶9　　　　RockAuto filed a complaint in the tax court, alleging ADOR's assessment was unlawful because RockAuto did not have a substantial nexus to Arizona during the audit period. Both parties moved for summary judgment. The tax court found that RockAuto lacked a substantial nexus to Arizona, denied ADOR's motion, and granted RockAuto's motion for summary judgment.

¶**10**        We have jurisdiction over ADOR's timely appeal under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), -170(C), and -2101(A)(1).

## DISCUSSION

### I.        Standard of Review

¶**11**        "[I]n determining whether either party is entitled to summary judgment, we must view the facts and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 13 (2003) (citation omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a); *accord Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990); *see also* Ariz. Tax Ct. R. Prac. 2 (incorporating the Arizona Rules of Civil Procedure into tax court proceedings). "Where the issues can be decided as a matter of law, we have the authority both to vacate the trial court's grant of summary judgment in favor of one party and to enter summary judgment for the other party if appropriate." *Carter Oil Co. v. Ariz. Dep't of Revenue*, 248 Ariz. 339, 347, ¶ 28 (App. 2020) (citation omitted).

### II.        Transaction Privilege Tax

¶**12**        Arizona can impose a transaction privilege tax only when the tax (1) "is applied to an activity with a substantial nexus with the taxing State"; (2) "is fairly apportioned"; (3) "does not discriminate against interstate commerce"; and (4) "is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). The sole issue here is whether RockAuto had a substantial nexus to Arizona during the audit period.

¶**13**        During the audit period,[6] a "substantial nexus" required a physical presence in the taxing state. *Quill Corp. v. North Dakota*, 504 U.S. 298, 306-07 (1992), *overruled in part by Wayfair*, 585 U.S. at 188. Under the physical presence test, states may not tax "seller[s] whose only connection with customers in the State is by common carrier or the United States mail."

---

[6] In 2018, the Supreme Court held that an economic presence establishes a substantial nexus to the taxing state. *See South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 188 (2018). Arizona's statute effectuating the economic nexus test was enacted after the audit period, and neither party suggests we should apply it here. *See* A.R.S. § 42-5044. According to RockAuto, it started paying transaction privilege tax once A.R.S. § 42-5044 took effect.

*Nat'l Bellas Hess, Inc. v. Dep't of Revenue of Ill.*, 386 U.S. 753, 758 (1967), *overruled in part by Wayfair*, 585 U.S. at 188. RockAuto argues it falls "squarely" on the non-taxable side of the "bright line" rule established in *Bellas Hess* and *Quill*. We disagree.

¶14        In *Bellas Hess*, the Supreme Court held that Illinois could not tax a company whose sole contact with Illinois was through catalogs and goods shipped to Illinois customers from out-of-state. *Id.* at 754–55. The Court reaffirmed this principle in *Quill*, where North Dakota sought to tax a company that maintained no in-state office or employees but shipped merchandise, including licensed software, to in-state customers from out-of-state locations. 504 U.S. at 301–02 n.1. The Court held that although the licensed software may have constituted a "slightest presence," it was insufficient to establish a substantial nexus. *Id.* at 315 n.8.

¶15        The companies in *Bellas Hess* and *Quill* shipped orders into the taxing state via *interstate* mail or common carrier. *See Bellas Hess*, 386 U.S. at 754–55; *Quill*, 504 U.S. at 302. In contrast, RockAuto's Arizona distributors shipped orders and accepted returns from Arizona customers via *intrastate* mail and common carrier. *See Arco Bldg. Sys., Inc. v. Chumley*, 209 S.W.3d 63, 73–74 (Tenn. Ct. App. 2006) (stating the *Bellas Hess* and *Quill* safe harbor did not apply when an out-of-state taxpayer contracted with an in-state manufacturer who manufactured products in the taxing state and shipped orders to the taxpayer's in-state customers via intrastate common carrier). Moreover, the companies in *Bellas Hess* and *Quill* had no in-state contractors working on their behalf, but RockAuto's Arizona distributors actively worked on RockAuto's behalf shipping orders, accepting returns, and distributing RockAuto's promotional materials. Thus, RockAuto does not fall "squarely" under *Bellas Hess* and *Quill*.

¶16        The Supreme Court took a different view where taxpayers used third parties to perform some business functions in the taxing state. *See Scripto, Inc. v. Carson*, 362 U.S. 207 (1960); *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232 (1987). In *Scripto*, the taxpayer had no in-state office or employees. 362 U.S. at 208–09. But the taxpayer had ten in-state "wholesalers or jobbers" who solicited orders from customers and forwarded those orders to the taxpayer's out-of-state office. 362 U.S. at 209–10. The Court noted that "the 'salesmen' [we]re not regular employees of [the taxpayer] devoting full time to its service," but concluded that "such a fine distinction is without constitutional significance [because t]he formal shift in the contractual tagging of the salesman as 'independent' neither results in changing his local function of solicitation nor bears upon its effectiveness in securing a substantial flow of goods into [the taxing state]." *Id.* at 211.

**¶17**        Similarly, in *Tyler Pipe*, the taxpayer had no in-state office or employees, but had an in-state independent contractor who solicited orders and "provid[ed the taxpayer] with virtually all their information regarding the [in-state] market."  483 U.S. at 250.  The Court quoted and agreed with the Washington Supreme Court's conclusion that the independent contractor's activities established the taxpayer's physical presence because the contractor's activities were "significantly associated with the taxpayer's ability to establish and maintain a market in th[e] state for the sales."  *Id.* at 250 (quoting and vacating *Tyler Pipe Indus., Inc. v. State*, 715 P.2d 123, 126 (Wash. 1986)).

**¶18**        RockAuto's business is also not analogous to either *Scripto* or *Tyler Pipe*.  In those cases, the taxpayer's in-state independent contractors directly solicited customers or sent the taxpayer information about the in-state market.  *Scripto*, 362 U.S. at 209; *Tyler Pipe*, 483 U.S. at 249–50.  *See also Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 556 (1977) (upholding a tax on a taxpayer's mail-order business when the taxpayer had two in-state offices with in-state employees soliciting sales for the taxpayer's magazine).  Here, RockAuto's distributors did not call or visit customers to solicit orders for RockAuto, and nothing suggests they provided RockAuto with information about the Arizona market.  Thus, RockAuto conducted more in-state activity than the businesses in *Bellas Hess* and *Quill*, but its distributors' activities differed from those in *Scripto* and *Tyler Pipe*.

III.    Arizona Cases

**¶19**        Our cases provide further guidance.  We have addressed whether a company has a physical presence in Arizona on three occasions. *See Ariz. Dep't of Revenue v. O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A.*, 192 Ariz. 200, 206 (App. 1997); *Ariz. Dep't of Revenue v. Care Comput. Sys., Inc.*, 197 Ariz. 414, 417, ¶ 15 (App. 2000); *Interlott Techs., Inc. v. Ariz. Dep't of Revenue*, 205 Ariz. 452, 457, ¶ 30 (App. 2003).

**¶20**        In *O'Connor*, an out-of-state furniture manufacturer built custom furnishings for an Arizona law firm.  192 Ariz. at 201–02.  The manufacturer did not maintain an office or property in Arizona, but it negotiated the contract in Phoenix in-person or by telephone.  *Id.* at 202. The furnishings were assembled at a Phoenix warehouse owned by the manufacturer's independent representative and then delivered on trucks owned by the manufacturer or a third-party delivery service.  *Id.* at 202–03. The manufacturer's employees unloaded the trucks and supervised the installation conducted by independent representatives.  *Id.* at 203.  Title passed to the firm when the manufacturer delivered the furnishings.  *Id.* at

202. And the manufacturer responded to warranty complaints by sending employees or hiring a local electrician. *Id.* at 203. We held that the manufacturer had a physical presence in Arizona because of the activities conducted by the taxpayer's employees and independent contractors in negotiating and fulfilling the contract. *Id.* at 206.

**¶21** In *Care Computer*, the taxpayer sold and licensed computer hardware and software. 197 Ariz. at 416, ¶ 9. The taxpayer did not own or lease property in Arizona, maintain inventory in Arizona, or have representatives "based or residing in Arizona." *Id.* The taxpayer conducted most of its transactions by mail or telefax and shipped goods to Arizona from out-of-state. *Id.* at 416–17, ¶¶ 10, 12. Out of 180 transactions in Arizona, two were leases where, at the end of the lease terms, the customer purchased the goods. *Id.* at 416, ¶ 10. The taxpayer had one salesperson based in California, who took seven one- to two-day business trips to Arizona over a seven-year period, and the taxpayer sent employees to Arizona to train customers. *Id.* at 416–17, ¶¶ 11, 13. We held that the taxpayer had a physical presence in Arizona because the salesperson's trips "were intended to, and did, result in additional sales," the training was "in part intended to, and presumably did, increase the satisfaction level of Arizona customers and encourage other [customers] to buy [the taxpayer's] products," and, although the "leases in Arizona were few in number and duration, [] they could, and did, develop into outright sales." *Id.* at 417, ¶ 15.

**¶22** Finally, in *Interlott*, the taxpayer leased lottery-ticket vending machines. 205 Ariz. at 453, ¶ 2. The taxpayer had two employees in Arizona who installed the machines, performed maintenance, responded to service calls, and moved the machines. *Id.* at ¶ 3. The taxpayer argued it had no physical presence because sales did not occur in Arizona, it did not maintain a market in Arizona, the employees' contacts did not result in Arizona business, and the transactions were merely short-term leases. *Id.* at 457, ¶ 26. We rejected each argument, holding that the taxpayer had a physical presence in Arizona, and noting that "[t]he existence of a sale is not essential to the creation of a nexus," "[p]erforming a contract is maintaining a market," and "an activity need not produce business in order to create a nexus." *Id.* at ¶¶ 27–30.

IV.    RockAuto's Arizona Activities

**¶23** RockAuto argues it had no physical presence in Arizona because its distributors did not have "in-person contact with Arizona customers for sales, product installation, and/or customer service." We disagree. Neither *Tyler Pipe*, nor our cases applying *Tyler Pipe*, turned on

whether the taxpayer's independent contractors had in-person contact with customers. Instead, *Tyler Pipe* and our cases focused on the activities performed in-state and whether those activities were significantly associated with the taxpayer's ability to establish and maintain an in-state market. *Tyler Pipe*, 483 U.S. at 250–51; *O'Connor*, 192 Ariz. at 205–06; *Care Comput.*, 197 Ariz. at 416, ¶ 8; *Interlott*, 205 Ariz. at 456, ¶ 22. Thus, we do the same here.

¶24 "Performing a contract is maintaining a market." *Interlott*, 205 Ariz. at 457, ¶ 28 (citation omitted). Online sales transactions are contracts where the customer promises to pay the price of the product and the seller promises to deliver the product to the customer. *See Armiros v. Rohr*, 243 Ariz. 600, 605, ¶ 17 (App. 2018). As an auto parts retailer, RockAuto entered contracts with its customers where the customer promised to pay the sale price and RockAuto promised to deliver the product. RockAuto did not maintain inventory, ship orders, or accept returns, so RockAuto depended on its distributors to perform these activities on RockAuto's behalf. And, when Arizona distributors fulfilled orders for Arizona customers, the product never left Arizona. Thus, except for the acceptance of orders, the essential portions of RockAuto's contracts with its customers were performed in Arizona by RockAuto's distributors. *See O'Connor*, 192 Ariz. at 206 ("Many of the activities that were essential to completing these sales occurred in Phoenix through employees and independent agents of [the manufacturer] acting on [the manufacturer's] behalf.").

¶25 Moreover, although "an activity need not produce business in order to create a nexus," *Interlott*, 205 Ariz. at 457, ¶ 29, activities that result in sales support finding a physical in-state presence, *see Care Comput.*, 197 Ariz. at 417, ¶ 15 (stating, "[t]he trips by [the taxpayer's] salesperson to Arizona were intended to, and did, result in additional sales"). RockAuto claims that its distributors did not solicit sales or advertise for RockAuto. But RockAuto's distributors were contractually required to use RockAuto's branded tape and include a RockAuto promotional magnet with each order. RockAuto's president said the tape was intended to improve name recognition and increase sales and that the magnets were "a reminder item so the customer hopefully puts it on his toolbox or refrigerator and remembers us the next time he needs auto parts." RockAuto asserts that these activities are irrelevant because the distributors "shipped nearly 90% of the magnets and tape outside of Arizona." But a representative's out-of-state sales activities do not impact whether we find a physical in-state presence. *See id.* at 416–17, ¶¶ 11, 15. And it is undisputed that the Arizona distributors sent RockAuto's promotional materials to Arizona customers.

**¶26** Further, activities that increase customer satisfaction support concluding a taxpayer has a physical presence in Arizona. *Id.* at 417, ¶ 15 (noting training provided to customers supported concluding a taxpayer had a substantial nexus to Arizona because it "w[as] in part intended to, and presumably did, increase the satisfaction level of Arizona customers and encourage other[s] . . . to buy [the taxpayer's] products"). RockAuto advertised that its prices were lower than its competitors' prices, and RockAuto's president said RockAuto competed against local retailers, in part, by having "[l]ower prices." Customers paid shipping costs directly, and customers complained when shipping costs were too high or delivery took too long. Shipping costs were not always directly related to distance, but cost and distance had a "linear" relationship. And, to reduce shipping times and costs, RockAuto had its distributors send orders directly to customers. Thus, even when viewed in a light most favorable to RockAuto, RockAuto's business model sought to increase customer satisfaction by reducing shipping times and costs for customers, which consequently helped RockAuto establish and maintain a market in Arizona.

**¶27** Finally, although the parties focus on RockAuto's distributors' activities, RockAuto's physical presence in Arizona was not limited to its distributors. During the audit period, RockAuto employees made four business trips to Arizona to meet with distributors. According to RockAuto, these trips were intended to strengthen RockAuto's relationships with its distributors. One state court noted that business trips like these may be sufficient to establish a physical presence in a taxing state. *Travelscape, LLC v. S.C. Dep't of Revenue*, 705 S.E.2d 28, 37 (S.C. 2011) (concluding that the fact that employees and representatives visited the taxing state "to enable [the taxpayer] to establish and maintain hotel relationships and obtain the discounted net room rate" "may be enough to satisfy the physical presence requirement"). *See also Care Comput.*, 197 Ariz. at 416–17, ¶¶ 11–12, 15 (concluding a salesperson's infrequent trips to follow up on "business prospects" supported concluding the taxpayer had a physical presence in Arizona). Because of RockAuto's distributors' activities, we need not conclude whether the trips alone were sufficient, but the trips support our conclusion that RockAuto had a physical presence in Arizona.

V.     RockAuto's Other Arguments

**¶28** RockAuto argues that various other factors show it had no physical presence in Arizona. We are not persuaded.

**¶29** RockAuto argues its distributors' activities were not significantly associated with establishing and maintaining a business in

Arizona because almost 90% of orders placed with Arizona distributors shipped to out-of-state customers, and more than 80% of orders placed by Arizona customers were shipped from out-of-state distributors. But RockAuto also claims that "[n]either the number of [Arizona] transactions nor the number of [Arizona] customers has anything to do with whether RockAuto had the requisite physical presence in Arizona." Essentially, RockAuto uses sales volume as both a sword and a shield by arguing that we should not consider the amount of business in Arizona as evidence that RockAuto had a physical presence in Arizona, while contending the amount of business conducted outside Arizona shows it had no physical presence in Arizona.

¶30            "[F]or the purpose of establishing nexus, the volume of local activity is less significant than the nature of its function on the out-of-state taxpayer's behalf." *O'Connor*, 192 Ariz. at 208. Thus, we agree with RockAuto that the number of Arizona transactions and customers do not dictate whether it had a physical presence in Arizona.

¶31            But we disagree with RockAuto that its distributors' out-of-state activities or contact with out-of-state customers shows RockAuto did not have a physical presence in Arizona. A representative's in-state activities support concluding a taxpayer has a physical in-state presence, even when the representative is predominately focused on serving an out-of-state market. *See Care Comput.*, 197 Ariz. at 416–17, ¶¶ 11, 15. In *Care Computer*, the taxpayer's salesperson lived in California and "focused almost exclusively on southern California." *Id.* at 416, ¶ 11. Over seven years, the salesperson made seven one- to two-day business trips to Arizona that produced sales. *Id.* at 416–17, ¶ 11. We concluded the trips supported finding the taxpayer had a physical presence in Arizona. *Id.* at 417, ¶ 15. Likewise, here, although most of the Arizona distributors' orders were shipped out-of-state, the orders shipped to Arizona customers support concluding RockAuto had a physical presence in Arizona.

¶32            Further, a taxpayer's in-state activities establish a physical presence, even if in-state customers are also served by out-of-state representatives. *Cf. Tyler Pipe*, 483 U.S. at 249–51 (noting solicitation of in-state sales was "directed by executives who maintain their offices out-of-state" but concluding the work of one in-state independent contractor established the taxpayer's physical in-state presence). Accordingly, our focus is on RockAuto's in-state activities, not RockAuto's out-of-state activities or out-of-state customers.

¶33            Finally, RockAuto claims it did not seek to maintain an Arizona market because it selected its distributors based on inventory and

ability to fulfill orders, not geography. But RockAuto chose to have six Arizona distributors fulfilling orders for some of its Arizona customers, and RockAuto controlled which distributor fulfilled each order. And, RockAuto's website said it offered lower prices than its competitors, partly because it shipped directly to customers from "centralized warehouses." RockAuto's claim that contracting with Arizona distributors was not intended to maintain an Arizona market does not change the nature of the distributors' activities. *See Scripto*, 362 U.S. at 211–12 ("The test is simply the nature and extent of the [in-state] activities of the [taxpayer].").

¶34     Thus, RockAuto had a physical presence in Arizona during the audit period, and ADOR could assess a transaction privilege tax on RockAuto's sales to Arizona customers.

## CONCLUSION

¶35     For the reasons stated, we vacate the judgment and award of attorneys' fees and costs and remand to the tax court for entry of summary judgment in favor of ADOR on the substantial nexus issue and to address the other issues in RockAuto's complaint.

¶36     RockAuto requests attorneys' fees pursuant to A.R.S. § 12-348(B). Section 12-348(B) authorizes an award of attorneys' fees to a taxpayer who "prevails by an adjudication on the merits." RockAuto has not prevailed, so we deny the request. We award ADOR its taxable costs on appeal pursuant to A.R.S. § 12-341 upon compliance with ARCAP 21(b).



AMY M. WOOD • Clerk of the Court
FILED:    TM